STATE of Maine

v.

James A. BELLINO.

Supreme Judicial Court of Maine.

July 31, 1978.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou, Deputy Dist. Atty., Thomas L. Goodwin (orally), Asst. Dist. Atty., Portland, for plaintiff.

Nisbet, MacNichol & Ludwig by Alexander MacNichol (orally), South Portland, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DUFRESNE, Active Retired Justice.[1]

James A. Bellino, the defendant, was accused of committing the offense of recklessly causing the death of Donald E. Zellers on July 13, 1975 in violation of 29 M.R.S.A., § 1315[2] by indictment dated October 29, 1975 which charged that

"on or about the Thirteenth day of July, 1975, in the Town of Scarborough, County of Cumberland and State of Maine, the above named defendant, James A. Bellino, did operate a motor vehicle, to wit: an automobile with reckless disregard for the safety of others and did thereby cause the death of another person, to wit: Donald E. Zellers, the death of said person resulting within one year, to wit: on the Thirteenth day of July, A.D., 1975, in that he, the said Defendant, at a time when his faculties were under the influence of intoxicating liquor, did drive a 1966 Chevrolet automobile, in which said Zellers was a passenger, during the hours of darkness, easterly over and along the wet surface of Route # 1, so-called, in said Scarborough, at a rate of speed which was excessive for the road conditions then and there existing; did lose control of said automobile so that it skidded approximately 444 feet, turned on its side, and struck a telephone pole with such force that said Zellers did receive fatal injuries from the collision."

Prior to trial of the case, the defendant, pursuant to Rule 41(e), M.R.Crim.P., moved the Superior Court in and for the County of Cumberland to suppress for use as evidence at trial the results of a blood alcohol test performed on a sample of blood extracted from his body. The reasons he asserts why the blood test results should be suppressed and not admitted in evidence are, first, that the blood sample was not obtained in compliance with the express prerequirements of 29 M.R.S.A., § 1312, and, secondly, if not taken in violation of the statute, the blood sample was obtained in violation of his Fourth Amendment rights against unreasonable searches and seizures as protected by the Constitution of the United States. After an evidentiary hearing, the Court denied the motion to suppress. The propriety of the interlocutory ruling is before us on report under Rule 37A(b), M.R.Crim.P. We sustain the defendant's appeal.

The record on appeal is presented to us upon the following agreed statement of facts approved by the trial Justice and certified as the record on appeal in full compliance with Rule 39(r), M.R.Crim.P.:

"Defendant Bellino was found unconscious behind the driving wheel of a car

---

1. Mr. Justice Dufresne sat at oral argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered and authorized to continue his participation in the case in his capacity of Active Retired Justice.

2. 29 M.R.S.A., § 1315 which was in effect at the time read in pertinent part as follows:

"Any person who operates a vehicle with reckless disregard for the safety of others and thereby causes the death of another person, when the death of such person results within one year, shall be guilty of the offense of reckless homicide. Any person convicted of reckless homicide shall be punished . . . ." This statute was repealed by Public Laws, 1975, c. 731, § 53, effective May 1, 1976. Reckless homicide is now punishable under the Maine Criminal Code pursuant to 17–A M.R.S.A., § 211.

involved in a one-car accident in Scarborough. His feet were entangled in the pedals and his body draped over the door. There was an odor of alcohol on his breath. One police officer (Scarborough policeman Richard Babine, who was present as a member of the Scarborough Rescue Unit rather than as a policeman) stated that there were some broken beer bottles in the area, and at least one which was unbroken, open and partially empty. The State Trooper who was investigating the accident, Blaine Jardine, stated that he did not see any beer bottles.

"The car had crashed sideways into a utility pole and was severely damaged. Trooper Jardine was aware that the eyewitness reporting the accident had stated that the car had been travelling at a great rate of speed just prior to the accident.

"The physical evidence also made it apparent that the car had been travelling at a great rate of speed. It had also been raining and the road was wet.

"A front seat passenger had to be helped out through the windshield. Donald E. Zellers, a passenger in the back seat, was found crushed by the roof and dead.

"Before Mr. Bellino was taken to the hospital, Trooper Jardine gave a blood test kit to Officer Babine in the hope that a blood-alcohol sample could be obtained from Mr. Bellino. According to Officer Babine, who was at the defendant's side the entire trip, defendant regained consciousness during that trip and remained awake during the examination by a doctor at least until he was taken to the X-ray room, where Officer Babine was not present.

"Following return from the X-ray room to the emergency ward 'cubicle' defendant appeared to be either asleep or unconscious, but was awakened, and was asked if a blood sample could be taken from him. Officer Babine informed defendant that he was a police officer. (He was not, of course, in a police uniform.) He warned defendant of the general consequences of refusing to submit to a test

(loss of license), but did not state specifically the length of suspension. Officer Babine also told the defendant that a breath test was not available since he did not have a breath test kit with him. When specifically asked whether he would submit to a blood test, the defendant stated after a short lapse of time, 'I don't give a shit.' The blood test was taken, the nurse who took the sample (Carol Dunphe) and Officer Babine having to force the defendant to roll over in order to gain access to his uninjured arm. Defendant shortly thereafter fell asleep again. He was suffering from a minor cerebral contusion.

"Defendant claimed he did not remember anything from shortly before his accident until his arrival at home.

"At no time did the officer arrest defendant or take any action which could be deemed in law to amount to an arrest, the defendant being under hospitalization. No restrictions were placed on defendant's movement beyond those caused by his own physical condition. No officers remained with defendant following the taking of the blood sample.

"The blood sample contained 0.12% alcohol by weight."

We note initially that the Justice below did not purport to rule on the defendant's knowledgeable and intelligent submission to the blood test. Indeed, he stated in his decision on the motion:

"Whether Defendant was consciously aware of what was happening or not is not governing. Under appropriate circumstances non-testimonial evidence may be obtained without consent and with or without a warrant.

"Here the blood sample and the results of the test thereof are of that nature.

"The natural process of the human physical system would cause the deterioration of such evidence therein. The exigency of the matter made the application for a warrant inappropriate and unnecessary. From the facts of the case the officer had sufficient probable cause.

The sample was taken in a safe, sterile, humane manner."

▪ Evidence bearing on facts having probative value, i. e. a legitimate tendency to establish or disprove controverted facts at issue in the case is relevant and admissible at trial, unless it be excluded by statute, or by some rule or principle of law.

As stated in *McCully v. Bessey*, 142 Me. 209, 214, 49 A.2d 230, 233 (1946):

"Rules of evidence are usually rules of exclusion, and evidence is often admitted, by the trial court, not because it is shown to be competent, but because it is *not* shown to be *incompetent*." (Emphasis in original)

Accord: *Rawley v. Palo Sales*, 144 Me. 375, 380, 70 A.2d 540, 543 (1949).

▪ Results of a chemical test of one's blood for alcohol content is relevant evidence admissible under the common law as a scientific fact. *State v. Demerritt*, 149 Me. 380, 386, 103 A.2d 106, 110 (1953). Such scientific evidence has been proven by experience to be "a reliable indicator of intoxication or sobriety." See *State v. Ballard*, Me., 385 A.2d 799, 802 (1978).[3]

The defendant contends that in this case the test results of his blood-alcohol level are inadmissible, because the blood sample, on which the test analysis was made, was taken in a manner contrary to the express requirements of 29 M.R.S.A., § 1312 and, by reason thereof, the reference statute declares such evidence incompetent by providing a special exclusionary rule to the effect that

"[i]f the law enforcement officer fails to comply with this prerequisite, any test results shall be inadmissible as evidence in *any* proceeding before *any* administrative officer or *court of this State*" (emphasis supplied),

the prerequisite referred to being as follows:

"Before any test specified is given, the law enforcement officer shall inform the arrested person of the consequences of his refusal to permit a test at the direction of the law enforcement officer."

Prior to the enactment of the implied consent law, the blood test statute—it could then be a blood, breath or urine test—(29 M.R.S.A., § 1312–1964 Revision) imposed no obligations on the part of either, the law enforcement authorities or the accused, of having chemical tests made for the determination of a motor vehicle operator's condition of intoxication or sobriety. As it then existed, the statute merely established the prima facie effect of a showing of certain quantities of alcohol in the blood, the statutory chart assigning to specific evidentiary percentages by weight of alcohol in the blood their correlative probative value in proof of the presence or absence of influence from alcohol consumed by the operator. The statutory scheme at that time, not only did not carry sanctions for refusals to submit to a test at the request of an enforcement officer, but, in recognizing the defendant's right to a reasonable opportunity to attempt to procure a blood test in his defense, expressly immunized his refusal or failure to have tests made from any adverse prejudicial effect by reason of a special exclusionary rule which provided that "the failure of a person accused of this offense [operation of a motor vehicle under the influence of intoxicating liquor or drugs, hereinafter referred to as O.U.I.] to have tests made to determine the weight of alcohol in his blood shall not be admissible in evidence against him." See *State v. Munsey*, 152 Me. 198, 200, 127 A.2d 79, 81 (1956).

The implied consent law, so-called, was first enacted in 1969 (P.L.1969, chapter 439), and then re-enacted with modification in 1971 (P.L.1971, chapter 547), and, as it existed at the time of the events involved in the instant case, read in pertinent part as follows:

29 M.R.S.A., § 1312. "Implied consent to chemical tests; operation under the influence of intoxicating liquor; penalties

"*Any person who operates* or attempts to operate *a motor vehicle within this State shall be deemed to have given consent to a*

**3.** See also *State v. Williams*, Me., 388 A.2d 500, 502 (1978); Rule 402, M.R.Evid.

*chemical test* to determine his blood-alcohol level by analysis of his blood or breath, *if arrested for operating* or attempting to operate *a motor vehicle while under the influence of intoxicating liquor.*

"He shall be informed by a law enforcement officer of the tests available to him, and said accused shall select and designate one of the tests. At his request he may have a test of his blood administered by a physician of his choice, if reasonably available.

"1. Prerequisites to tests. Before any test specified is given, the law enforcement officer shall inform the *arrested* person of the consequences of his refusal to permit a test at the direction of the law enforcement officer. If the law enforcement officer fails to comply with this prerequisite, any test results shall be inadmissible as evidence in any proceeding before any administrative officer or court of this State.

"2. Hearing. If a person *under arrest* refuses upon the request of a law enforcement officer to submit to a chemical test to determine his blood-alcohol level by analysis of his blood or breath, none shall be given. The Secretary of State, upon the receipt of a written statement under oath of the *arrest* of a person *for operating* or attempting to operate *a motor vehicle while under the influence of intoxicating liquor,* and that such person had refused to submit to a chemical test to determine his blood-alcohol level by analysis of his blood or breath, shall immediately notify the person, in writing, as provided in section 2241 that his license or permit and his privilege to operate have been suspended. Such suspension shall be for a period of 3 months for a first refusal under this or any prior implied consent provision under Maine law. If such refusal is a 2nd or subsequent refusal under this or any prior implied consent provision under Maine law, such suspension shall be for a period of 6 months.

"If such person desires to have a hearing, he shall notify the Secretary of State within 10 days, in writing, of such desire. Any suspension shall remain in effect pending the outcome of such hearing, if requested.

"The scope of such a hearing shall cover *whether the individual was lawfully placed under arrest* and whether he refused to submit to one of the tests upon the request of a law enforcement officer.

"If it is determined, after hearing when such is requested, that such person was not arrested or did not refuse to permit a chemical test to determine his blood-alcohol level by analysis of his blood or breath, any suspension in effect shall be removed immediately.

"3. Review. Any person, whose license, permit or privilege to operate is suspended for refusal to submit to a chemical test to determine his blood-alcohol level by analysis of his blood or breath at the direction of a law enforcement officer *after having been arrested for operating* or attempting to operate *while under the influence of intoxicating liquor,* shall have the right to file a petition in the Superior Court in the county where he resides, or in Kennebec County, to review the order of suspension by the Secretary of State by the same procedure as is provided in section 2242.

"4. Results of test.

    \*      \*      \*      \*      \*      \*

"5. Blood-alcohol level.

"A. If there was, at the time alleged, 0.05% or less by weight of alcohol in the defendant's blood, it is prima facie evidence that the defendant was not under the influence of intoxicating liquor.

"B. If there was, at the time alleged, in excess of 0.05%, but less than 0.10% by weight of alcohol in the defendant's blood, it is relevant evidence, but it is not to be given prima facie effect in indicating whether or not the defendant was under the influence of intoxicating liquor within the meaning of this section, but such fact may be considered with other competent evidence in determining whether or not the defendant was under the influence of intoxicating liquor.

"C. If there was, at the time alleged, 0.10% or more by weight of alcohol in the defendant's blood, it is prima facie evidence

that the defendant was under the influence of intoxicating liquor within the meaning of this section.

"D. Percent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred millimeters of blood.

"6. Administration of tests. Persons conducting chemical analysis of blood or breath for the purpose of determining the blood-alcohol level shall be certified for this purpose by the Department of Health and Welfare under certification standards to be set by that department.

"Only a duly licensed physician, registered nurse or a person certified by the Department of Health and Welfare under certification standards to be set by that department, acting at the request of a law enforcement officer, *with the consent of the defendant,* may draw a specimen of blood for the purpose of determining the blood-alcohol level thereof. This limitation shall not apply to the taking of breath specimens.

"A law enforcement officer, *with the consent of the person from whom the sample is to be taken,* may take a sample specimen of the breath of any person arrested for operating or attempting to operate a motor vehicle while under the influence of intoxicating liquor, said sample specimen to be submitted to the Department of Health and Welfare or a person certified by the Department of Health and Welfare for the purpose of conducting chemical tests of the sample specimen to determine the blood-alcohol level thereof.

"Only such equipment as is approved by the Department of Health and Welfare shall be used by a law enforcement officer to take a sample specimen of the defendant's breath.

"Approved equipment shall have a stamp of approval affixed by the Department of Health and Welfare. Evidence that such equipment was in a sealed carton bearing said stamp of approval shall be accepted in court as prima facie evidence that such equipment was approved by the Department of Health and Welfare for use by the law enforcement officer to take the sample specimen of the defendant's breath.

"7. Liability.

\* \* \* \* \* \*

"8. Evidence. The percentage by weight of alcohol in the defendant's blood at the time alleged, as shown by the chemical analysis of his blood or breath shall be admissible in evidence.

"9. Payment for tests.

\* \* \* \* \* \*

"10. Penalties.

A.

\* \* \* \* \* \*

"B. *Any officer authorized to arrest for violations of this section may arrest, without a warrant, any person involved in a motor vehicle accident, if the officer has probable cause to believe that such person has violated this section.*

"C. *Every person operating a motor vehicle which has been involved in an accident or which is operated in violation of any of the provisions of this Title shall, at the request of a police officer, submit to a breath test to be administered by the police officer. If such test indicates that the operator has consumed alcohol, the police officer may require such operator to submit to a chemical test in the manner set forth in this section.*

"D. In alleging a prior conviction under this section, . . ." (Emphases provided)

The interpretation to be given to the implied consent law of this State must be prefaced upon the decisions of the United States Supreme Court in *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), decisions which we must presume the Legislature was aware of when it enacted such legislation.

In *Breithaupt,* the Court concluded that "a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' (citation omitted) nor such a method of obtaining evidence that it of-

fends a 'sense of justice,' (citation omitted).

\* \* \* \* \* \*

"As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the assumption of deterrence, the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions."

*Schmerber,* on the other hand, held that bodily substance specimens were not subject to the exclusionary rule under the Fourth Amendment in a context where the samples were taken as an incident to a lawful arrest, by a reliable and accepted method, in a reasonable and medically approved manner, and where the enforcement officer had probable cause to believe that evidence of driving under the influence of intoxicating liquor did exist, the Court further viewing the progressive elimination of alcohol by natural bodily functions . as presenting exigent circumstances which obviate the necessity of procuring a search warrant.

■ Even with the *Breithaupt* and *Schmerber* decisions in mind, our Legislature, as a perusal of the implied consent legislation clearly demonstrates, has shown a great concern over the right of the State to take blood or breath samples of the motoring public. It has circumscribed the State's right by the use of limitational expressions such as "if arrested for operating . . . a motor vehicle while under the influence of intoxicating liquor," "the arrested person," "a person under arrest," "whether the individual was lawfully placed under arrest," "after having been arrested," "with the consent of the defendant." It would seem that the drafters of the implied consent legislation by such explicit language contemplated a lawful arrest of an offending motorist, together with his actual consent, as the triggering elements to the application of the implied-consent-to-a-sobriety-test law.

The authorities have so construed similar implied consent legislation, both in cases involving charges of operating a motor vehicle under the influence of intoxicating liquor or in cases in which the crime charged was reckless homicide or manslaughter, the operator being conscious at the time of the taking of the bodily specimen. See *State v. Auger,* 124 Vt. 50, 196 A.2d 562 (1963); *State v. Cruz,* 21 Utah 2d 406, 446 P.2d 307 (1968); *People v. Superior Court of Kern County,* 6 Cal.3d 757, 100 Cal.Rptr. 281, 493 P.2d 1145 (1972); *State v. Wetherell,* 82 Wash.2d 865, 514 P.2d 1069 (1973); *People v. Todd,* 59 Ill.2d 534, 322 N.E.2d 447 (1975); *Layland v. State,* 535 P.2d 1043 (Alaska 1975). See also, *Commonwealth v. Murray,* 441 Pa. 22, 271 A.2d 500 (1970). To the contrary: *State v. Mitchell,* 245 So.2d 618 (Fla., 1971); *State v. McMaster,* 118 N.J.Super. 476, 288 A.2d 583 (1972). The Michigan Court has limited the implied consent law to O.U.I. cases. *People v. Keen,* 396 Mich. 573, 242 N.W.2d 405 (1976).[4]

---

4. Where the defendant was unconscious at the time the blood sample was taken, the authorities in interpreting their implied consent legislation are divided respecting the admissibility of the test results. On the side of inadmissibility in O.U.I. cases: *Otte v. State,* 172 Neb. 110,

108 N.W.2d 737 (1961); see also *State v. Davis,* 108 N.H. 45, 226 A.2d 873 (1967). But the test results were held admissible in *State v. Findlay,* 259 Iowa 733, 145 N.W.2d 650 (1966), where the implied consent law specifically provided that if the person is dead, unconscious or in a

In the instant case, the defendant Bellino was charged with the crime of reckless homicide in violation of 29 M.R.S.A., § 1315. Section 1315 of Title 29 was enacted prior to the implied consent law (Public Laws of 1957, chapter 333) and coexisted with Section 1312 after the Legislature incorporated into Section 1312 the implied consent law of 1969 as amended in 1971. Hence, the issue presented to us is, whether the conditions precedent to the admissibility of the chemical test results obtained in the analysis of the defendant's blood sample, which conditions the implied consent law mandates, are applicable in a case such as this, i. e. of reckless homicide.

■ The overall purpose of our implied consent statute is not so much to protect the individual operator of a motor vehicle from an otherwise reasonable search and seizure from his person, but rather, to increase the incidence of consensual searches and seizures on the part of the driving public through the taking of blood and breath samples for alcohol testing in a legislative effort to deter the operation of motor vehicles under the influence of intoxicating liquor and promote the safety of our highways.

As stated in *State v. Van Reenan,* Me., 355 A.2d 392, 395 (1976):

"The Legislature has, simply made a policy decision that upon an arrested driver's refusal to submit to the test, *the State should forego the use of force* to obtain the specimen and, *instead, should rely upon the sanction of suspension to persuade* arrested drivers to submit and to influence other drivers to maintain sobriety." (Emphasis added)

condition rendering him incapable of consent or refusal, he shall be deemed not to have withdrawn the consent and the test may be given.

In cases other than O.U.I. including reckless homicide and manslaughter, for courts holding the test results inadmissible, see *State v. Kroening,* 274 Wis. 266, 79 N.W.2d 810 (1957); *Lebel v. Swincicki,* 354 Mich. 427, 93 N.W.2d 281 (1958); *State v. Towry,* 26 Conn.Sup. 35, 210 A.2d 455 (1965); *State v. Capelle,* 285 Minn. 205, 172 N.W.2d 556 (1969); *State v. Howard,* 193 Neb. 45, 225 N.W.2d 391 (1975); *People v. Todd,* 59 Ill.2d 534, 322 N.E.2d 447

From the agreed statement of facts, it appears that the defendant, prior to the taking of a blood sample from his person, was never under arrest, nor did the officer, in the information imparted to the defendant regarding the consequences of his refusal to submit to a test, disclose to Bellino the specific length of the license suspension which such a refusal would incur. Failure to comply with the reference prerequisites mandated by 29 M.R.S.A. § 1312 would trigger the application of the special exclusionary provision of said section to the effect that

"[i]f the law enforcement officer fails to comply with this prerequisite, any test results shall be inadmissible as evidence in any proceeding before any administrative officer or court of this State,"

if these provisions of section 1312 are to be construed as incorporated into section 1315, the reckless homicide statute.

■ The court must look to the history of the statute and to the policy behind it to ascertain legislative intent as the court should implement not only the intent, but also the policy of the Legislature. *State v. Blaisdell,* 118 Me. 13, 105 A. 359 (1919); *Austin v. State,* 160 Me. 240, 202 A.2d 794 (1964), cert. denied 382 U.S. 1018, 86 S.Ct. 636, 15 L.Ed.2d 533; *Prudential Ins. Co. of America v. Insurance Com'r,* Me., 293 A.2d 529, 538 (1972); *State v. Allard,* Me., 313 A.2d 439, 447 (1973).

Prior to the enactment of the implied consent law in 1969 (Public Laws, 1969, c. 439), the Legislature had made the taking of chemical tests to determine the blood

(1975). To the contrary: *People v. Fidler,* 175 Colo. 90, 485 P.2d 725 (1971); *State v. Deshner,* 158 Mont. 188, 489 P.2d 1290 (1971); *Carrington v. Superior Court, County of Riverside,* 31 Cal.App.3d 635, 107 Cal.Rptr. 546 (1973). It was held error to charge the statutory presumption or prima facie concept of certain statutory percentages under the implied consent law in reckless homicide cases in *Hoffman v. State,* 160 Neb. 375, 70 N.W.2d 314 (1955); *People v. Leis,* 13 A.D.2d 22, 213 N.Y.S.2d 138 (1961); *State v. Aarhus,* 80 S.D. 569, 128 N.W.2d 881 (1964).

alcohol level of a person's blood in connection with the O.U.I. section of the statute completely voluntary and penalty free. The statutory percentages by weight of alcohol in the blood, together with their statutory evaluation as evidence, were introduced to the law of Maine by Public Laws, 1939, chapter 273, which carried its own limited exclusionary rule by providing that

"[t]he failure of a person *accused of this offense* [O.U.I.] to have tests made to determine the weight of alcohol in his blood shall not be admissible in evidence against him." (Emphasis supplied)

The same 1939 Legislature added to the O.U.I. statute a new section (section 88–A), which provided for the revocation of the license of the operator of a motor vehicle convicted of the crime of manslaughter as the result of the operation of a motor vehicle *in such a manner as to cause the death of a person.* We note that this new section referred to the crime of manslaughter as then generally provided by statute prior to the enactment of the specific reckless homicide provision. We also take notice that the Legislature specifically made certain aspects of the new legislation applicable to both sections (section 88–A relating to revocation of licenses in manslaughter convictions and section 88 concerning revocations in O.U.I. cases:

"For the purposes of this section and of section 88 of this chapter, a person shall be deemed to have been convicted if he pleaded guilty or nolo contendere or was adjudged or found guilty by a court of competent jurisdiction, whether or not he was placed on probation without sentence or under a suspended sentence or the case was placed on file or on special docket."

The main legislative purpose, which, as stated in *State v. Van Reenan,* supra, favored reliance on license suspension sanctions and repudiated the use of force by enforcement officers in an effort to get motor vehicle operators suspected of having consumed alcohol to voluntarily submit to the taking of chemical tests for determination of the alcohol level of their blood, was a policy decision reached by the Legislature

in its goal to provide safety on the highways of the State. True, the *Van Reenan* case was one in which the defendant was charged with O.U.I., but the same legislative purpose which the court perceived in interpreting Section 1312 of Title 29 which involved operating under the influence of intoxicating liquor could rationally be imputed to the Legislature, if it did intend to carry the stated legislative policy to Section 1315 of Title 29, i. e. the reckless homicide section. Whether the license suspension periods of three or six months under the 1971 amendment (commensurate with the penalty provisions of O.U.I. violations) would be a sufficient inducement for driver cooperation in cases of reckless homicide violation of Section 1315 which carries a possible penalty upon conviction of five years imprisonment must be left to legislative determination and not be subject to judicial law-making.

██ It is for the court to interpret the law. It does so by ascertaining the express or underlying legislative purpose and intent involved in the particular legislation, since legislative intent once ascertained either by plain view or judicial analysis must prevail and be carried out, as the intention of the law-makers is the law. *State v. Taplin,* Me., 247 A.2d 919, 922 (1968); *Collins v. State,* 161 Me. 445, 451, 213 A.2d 835, 838 (1965). The expressed intent of the law-making body is controlling. *State v. Seaburg,* 154 Me. 210, 212, 145 A.2d 559, 561 (1958).

██ Our Legislature did expressly subject, with modification, the reckless homicide section (§ 1315) to the implied consent law (§ 1312), when it amended that law in 1971 by adding subsection 10–C in section 1312. Subsection 10–C·of section 1312 provides:

"Every person operating a motor vehicle which has been involved in an accident or *which is operated in violation of any of the provisions of this Title* shall, at the request of a police officer, submit to a breath test to be administered by the police officer. If such test indicates that the operator has consumed alcohol, the

police officer may require such operator to submit to a chemical test *in the manner set forth in this section.*" (Emphasis added)

The facts of this case involve a probable violation of 29 M.R.S.A., § 1315, the reckless driving section. When the Legislature in subsection 10–C referred to the operation of a motor vehicle *in violation of any of the provisions of this Title,* it is obvious that it intended to reach reckless homicide violations, as section 1315 is part and parcel of Title 29, as much so as section 1312 is. Hence, that addendum must be viewed as controlling in so far as the taking of a chemical test is concerned, where, as in this case, the person is suspected of operating a vehicle with reckless disregard for the safety of others and thereby causing the death of another person and where the facts to support the fatal reckless operation consist of having operated under the influence of intoxicating liquor. We take notice that subsection 10–C does not expressly require an arrest as a condition precedent to its application. Rather, it subjects the operator initially to a compulsory investigative process to determine whether the operator has consumed alcohol, this through what may be termed a preliminary unofficial breath test to be used only to establish probable cause for the requirement of an official second chemical test, blood or breath, if the preliminary breath test results are positive.

The preliminary breath test contemplated by subsection 10–C of section 1312 is not made conditional upon the operator's withdrawal of his original consent to a chemical test determination of his blood for alcohol content, which original consent under section 1312 arises generally from the operation of a motor vehicle and which consent under subsection 10–C specifically arises from the operation of a motor vehicle which has been involved in an accident or which is operated in violation of any of the provisions of this Title (including the provisions of section 1315—the reckless homicide statute). Nor is an arrest of the person expressly required for its application.

We need not decide whether the preliminary breath test for a positive determination of the operator's alcohol consumption in a case of reckless homicide such as this is a necessary prerequisite in any event to the right of the police officer to require the operator to submit to an official blood or breath test as provided in O.U.I. cases, nor do we need to decide whether an arrest of the person is also a necessary prior condition. Assuming that the existence of probable cause to suspect alcohol involvement legally dispenses from the giving of the preliminary breath test and that an arrest of the person need not be effected, (questions upon which we intimate no opinion), the instant blood test results would not be admissible, because the officer failed to inform Bellino of the specific consequences to which his refusal to submit to such a test would subject him. As stated in *State v. Granville,* Me., 336 A.2d 861, 863 (1975):

"The statute itself declares that if the law enforcement officer fails to comply with this prerequisite, i. e., fails to inform the person arrested of the consequences of his refusal to permit a test, the test results shall be inadmissible in evidence."

Subsection 10–C of section 1312, as it applies to section 1315 in a case where indications are that the operator had consumed alcohol, purports to sanction a police officer's request that such operator submit to a chemical test *in the manner* set forth in this section (i. e. in section 1312). This specific language is a clear indication of legislative intention to preserve to the operator his right to withdraw his presumptive statutory consent to a chemical test of his blood for alcohol content, or to refuse to do so under the penalties provided for such refusal.

We do hold that, as the law existed at the time of the events in this case, both the information prerequisites to the giving of any test and the exclusionary rule on the failure of the law enforcement officer to comply applied, by express reference of the statute, to 29 M.R.S.A., § 1315, the reckless

homicide section.[5] This is consistent with our holding in *State v. Rhoades,* Me., 380 A.2d 1023 (1977), where this Court held that an instruction based on the statutory effect of the results of a blood analysis in percentage by weight of alcohol in the blood was proper in a case of reckless homicide and rejected the specific contention of the defendant that the statutory inference applied only to prosecutions for operating under the influence of intoxicating liquor.

*State v. Hartman,* 256 N.W.2d 131 (S.D. 1977) is distinguishable, in that the South Dakota statute did not expressly carry an exclusionary rule respecting subsequent prosecutions.

The blood test results in this case are inadmissible for having been obtained contrary to statute which expressly excludes them as evidence. We do not reach the constitutional issue raised.

The statute does not require that a blood or breath test be administered under either section 1312 or 1315 of 29 M.R.S.A., nor must proof of operation of the vehicle while under the influence of intoxicating liquor be confined to evidence of a chemical analysis of one's blood for alcohol content. Absence of such test results does not preclude conviction for reckless homicide under 29 M.R.S.A., § 1315. See *State v. Sawyer,* Me., 382 A.2d 1051 (1978).

The entry is,

Appeal sustained.

Superior Court judgment denying motion for suppression of test results of chemical analysis of defendant's blood vacated. Remanded for further proceedings consistent with this opinion.

**5.** We note that, after the repeal of 29 M.R.S.A., § 1315 (Public Laws 1975, c. 731, § 53), the Legislature modified the language of section 1312, subsection 10–C by deleting therefrom the words "or which is operated in violation of any of the provisions of this Title," so that it now reads:

29 M.R.S.A., § 1312, sub-§ 11.

"11. Accidents. Every person operating a motor vehicle which has been in an accident shall, at the request of a police officer, submit to a breath test to be administered by the police officer. If the test indicates that the operator has consumed alcohol, the police officer may require such operator to submit to a chemical test in the manner set forth in this section." (Public Laws 1977, c. 498, § 2).

We intimate no opinion as to the effect of this deletion in the case of manslaughter cases under the new Criminal Code.