STATE of Maine

v.

**William J. PLANTE.**

Supreme Judicial Court of Maine.

Argued May 6, 1980.

Decided Aug. 7, 1980.

David W. Crook, Dist. Atty., Susan B. Cole (orally), Asst. Dist. Atty., Augusta, for plaintiff.

Ronald L. Bishop (orally), Waterville, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN, and ROBERTS, JJ.

GODFREY, Justice.

On September 21, 1979, defendant William Plante was convicted after a jury trial in Superior Court, Kennebec County, of operating a motor vehicle while under the influence of intoxicating liquor in violation of 29 M.R.S.A. § 1312 (1978 & Supp.1979–80).[1] On appeal, defendant contends that the results of the chemical blood test administered to determine his blood-alcohol level were improperly admitted in evidence because his consent to the test was not voluntarily given. Defendant contends also that the trial justice, who imposed the maximum sentence of ninety days' imprisonment, deprived defendant of his right to due process and chilled his right to present a defense by basing the sentence on the judge's announced belief that defendant and the witnesses who testified on his behalf had perjured themselves. We affirm the judgment.

## I.

In the early morning hours of April 14, 1979, Officer Brown of the Winthrop Police Department stopped the car defendant was driving after following it and observing it cross the center line several times. Defendant admitted that he had been drinking during the evening but said that he had consumed only four beers. When he was unable to perform satisfactorily a "field sobriety test", Officer Brown arrested him for operating under the influence. At the Winthrop police station, where defendant was transported after his arrest, Officer Brown read defendant the implied consent form and offered him the choice between a blood test and a breath test for the purpose of determining his blood-alcohol level. Officer Brown testified that in response to defendant's questions:

I advised him that at least if he took a test he stood a chance because of the test coming back; otherwise it was his word against mine, as to the operation and whatnot, where if he took the test, and if he in fact had had only four beers like he said, then, you know, he was not under the influence, and the test would show it, and, you know, the test would be prima facie evidence. I advised him that if the test was below .10, that I would drop the charges.

. . . . .

I advised him that if he took the test that at least he stood a chance of evidence, hard, fact proof that he was not, otherwise, it would have to go to a trial, and it would be my testimony against his and the other officers and all his friends, in the case it went to a full trial, in other words, whereas if he took a test and it was close, I would automatically drop the charge.

Defendant then chose to have a blood test taken. Robert Morganer, a chemist called as a state's witness, testified that he tested defendant's blood sample and that the sample had a concentration of 0.12 percent ethanol.

As his first claim of error defendant contends that the police "promise" to drop the charges if the blood test results were be-

---

1. P.L.1979, ch. 701, §§ 32 & 33 repealed and replaced subsections 1, 2, 3 & 8 of section 1312, effective July 3, 1980. The new provisions, which abrogate the former statutory exclusionary rule, are not directly applicable to the present case.

low .10 percent was impermissible. Citing *State v. Stevens*, Me., 252 A.2d 58 (1969), in support of his argument that the standard of voluntariness applicable to admissibility of confessions should be applied also under 29 M.R.S.A. § 1312, defendant contends that his consent to the blood test was involuntary and that the test results should have been therefore excluded from evidence.

*State v. Stevens, supra*, was not decided under our present implied-consent statute. The statute then in force, derived from R.S. 1954, ch. 22, § 150, created only standards defining prima facie proof of intoxication based upon certain blood-alcohol levels as determined by chemical tests; it did not establish a right in the state to obtain such tests from an arrested driver. *State v. Ayotte*, Me., 333 A.2d 436, 439 (1975); *State v. Munsey*, 152 Me. 198, 200, 127 A.2d 79, 81 (1956). In *State v. Merrow*, 161 Me. 111, 208 A.2d 659 (1965), which this Court relied on in *Stevens*, we found compelling statutory implications that actual consent to the extraction of a defendant's blood for testing was required, and we held procedures for determining the voluntariness of confessions applicable to the issue of consent under § 1312.

That statute was repealed in 1969 and replaced by a prototype of the present implied-consent statute. Enacted to increase the availability of reliable evidence about the accused's sobriety, the implied-consent statute authorizes the chemical testing of a person arrested for operating or attempting to operate a motor vehicle while under the influence of intoxicating liquor and establishes sanctions for refusal to submit to such testing. The operator who is arrested for driving under the influence has an initial duty by force of the statute to submit to chemical testing. However, the statute also gives him the power—though not the right—to refuse to perform that duty; *i. e.*, he may, in effect, withdraw his "implied consent". If the arrested motorist does exercise his power of refusal, the state has no right to compel him to submit to chemical testing but he becomes subject to the penalty of having his operator's license suspended.

■ Unlike its predecessor, the implied-consent law does not require affirmative consent to testing by the arrested person in order to bring the evidentiary provisions of the statute into operation; consent to testing is implied from the arrested motorist's having operated or attempted to operate a motor vehicle within the state. *State v. Shepard*, Me., 323 A.2d 587 (1974).

■ As applicable to this case, subsection 1 (since repealed and replaced, see note 1 *supra* ) of section 1312 provided:

1. *Prerequisites to tests.* Before any test specified is given, the law enforcement officer shall inform the arrested person of the consequences of his refusal to permit a test at the direction of the law enforcement officer.

If the law enforcement officer fails to comply with this prerequisite, any test results shall be inadmissible as evidence in any proceeding before any administrative officer or court of this State.

This information requirement was designed to assure that an arrested person who exercised his power to refuse testing did so with full awareness of the consequences of such refusal. The former subsection 1 exclusionary rule applied only where the law enforcement officer had not complied with the provisions of that subsection; *i. e.*, where the defendant had not been given the opportunity to make an informed choice between submission to a chemical test and suspension of his operator's license. *State v. Bellino*, Me., 390 A.2d 1014 (1978); *State v. Van Reenan*, Me., 355 A.2d 392 (1976); *State v. Granville*, Me., 336 A.2d 861 (1975).[2]

---

2. *State v. Granville*, Me., 336 A.2d 861, 863 (1975), referred to "informed consent" as requisite for avoiding the operation of the exclusionary rule in the former subsection 1 of the statute. *State v. Van Reenan*, Me., 355 A.2d 392, 395 (1976), made it clear that what was required was "an informed choice" on the part of the arrested motorist in deciding whether to refuse to submit to testing. If the information given by the officer about the consequences of refusal to submit to testing was inadequate, the choice was not an "informed" one and the test

This exclusionary rule is purely statutory; it has nothing to do with constitutional rights of the arrested person under the fourth amendment. *Cf. Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The power of refusal is not, as argued by defendant, equivalent to rights created by the federal and state constitutions.

■ Defendant does not contend that his submission to the test resulted from impermissible governmental coercion that effectively deprived him of his ability to refuse to submit to chemical testing.[3] The allegedly "impermissible promise" by Officer Brown to drop the charges against defendant if the test results were "close" was made in response to the defendant's own questions and request for advice. The evidence is uncontroverted that Officer Brown advised defendant of his right to refuse chemical testing and explained adequately the statutory penalty for such refusal. In those circumstances, the statutory prerequisites at the time of the offense for the admissibility of defendant's blood test re-

sults were met, and the evidence was properly before the jury.

## II.

Three days after the trial, the presiding justice held a hearing for sentencing of the defendant.[4] Having been informed by the assistant district attorney of the defendant's criminal record, the judge questioned the defendant directly about that record and verified entries to the effect that defendant had been convicted of larceny and trespass in 1973, trespass in 1975, taking by unauthorized transfer in 1979, and making excessive noise with a motor vehicle ("squealing tires") in 1978 or 1979. Defendant had no prior convictions for operating under the influence. The trial justice then said:

The Court is disturbed in view of the testimony presented in this particular case. The testimony of the Defendant indicated that this man did not start drinking until sometime early in the evening, according to his own testimony, sometime around 8 o'clock, when he possibly had one drink of beer at the Cellar,

---

results were excludable under the former subsection 1.

Subsection 6 of section 1312 provides for consent of the person to be tested before a specimen of blood or a specimen of breath is taken. Those provisions are to be regarded as merely administrative, reflecting the probability that, in practice, the arrested person who intends not to exercise his statutory power to refuse chemical testing will be making a choice among the approved available methods of testing. *See State v. Deering*, Me., 384 A.2d 447, 448 (1978). The "consent" provisions in subsection 6 are not intended to superimpose some requirement of actual consent to chemical testing on top of the basic requirement that section 1312 imposes on an arrested motorist, that he will submit to chemical testing if arrested for operating under the influence. *Cf.* 29 M.R.S.A. § 1312(8) as repealed and replaced by P.L.1979, ch. 701, § 33, effective July 3, 1980: "The revocation of a person's implied consent to a chemical test by refusing to allow the taking of a sample specimen as authorized by this section shall be admissible in evidence on the issue of whether that person was under the influence of intoxicating liquor. . . ." Our reference to "actual consent" in *State v. Bellino*, Me., 390 A.2d 1014, 1020 (1978), relates to the fact that a defendant has the power, by refusing to be tested, to withdraw his consent (otherwise im-

plied) to chemical testing, with the consequences provided in the statute.

3. *See State v. Van Reenan*, Me., 355 A.2d 392, 395 (1976):

. . . Indeed, an arrested driver had no *right* to deny the State the use of the specimen for the test which the Legislature has determined to be required of all citizens so arrested. The Legislature has simply made a policy decision that upon an arrested driver's refusal to submit to the test, the State should forego the use of force to obtain the specimen and, instead, should rely upon the sanction of suspension to persuade arrested drivers to submit and to influence other drivers to maintain sobriety.

4. At the time of the offense, 29 M.R.S.A. § 1312(10)(A) (repealed and replaced by P.L. 1979, ch. 422, § 2, effective September 14, 1979), provided in part:

Notwithstanding the provisions of Title 17–A, section 4–A, any person who, while under the influence of intoxicating liquor or drugs, operates or attempts to operate a motor vehicle within this State shall be punished, on his first conviction, by a fine of not more than $1,000 or by imprisonment for not more than 90 days, or by both.

and then he had three more beers at the Roundhouse, which is the equivalent of four beers, and that was over a period of approximately four hours, or possibly four-and-a-half hours. Following that he left and went to MacDonald's and spent half to three-quarters of an hour there ordering and eating, and he spent a half an hour, at least, getting to Winthrop where he was apprehended, and it was another half-an-hour to three-quarters of an hour before the blood test was taken, as he testified, so that there was almost an hour-and-a-half to two hours that elapsed after that, so over a period of six hours where he had only four beers, and he still showed a blood test of .12, which is utterly impossible as far as this Court is concerned.

On the basis of that testimony I feel he perjured his testimony, and he got his witnesses to come in and perjure themselves also, and on that basis I am going to impose a ninety-day County Jail sentence; Ninety days in the County Jail.

■ On appeal, the defendant argues that the trial justice impermissibly based the sentence solely on his conclusion that defendant had perjured himself in the trial. Defendant contends that the judge thereby violated his due-process right to be indicted, tried and convicted of the crime of perjury before, in effect, sentencing him for that crime. Also, defendant contends that to permit such a factor to enhance the severity of a sentence penalizes a defendant, in effect, for testifying in his own defense.

As an initial matter, we do not interpret the justice's remarks as a statement that the only basis for sentencing defendant to ninety days was his finding that defendant and his witnesses had perjured themselves. Since he had inquired into defendant's criminal record at some length immediately before announcing his finding of perjury, a fair reading of the judge's remarks in the context of the entire hearing leads to the conclusion that defendant's prior record played at least some role in the decision to incarcerate him. We thus approach the issue raised by defendant on the assumption that the finding of perjury was not the sole basis of the sentence.

In *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), the United States Supreme Court rejected constitutional arguments identical to those presented by appellant here and held that a sentencing judge may explicitly take into consideration his conclusion that defendant has lied on the stand. With respect to the due process argument, the Supreme Court said:

[I]t is proper—indeed, even necessary for the rational exercise of discretion—to consider the defendant's whole person and personality, as manifested by his conduct at trial and his testimony under oath, for whatever light those may shed on the sentencing decision. The 'parlous' effort to appraise 'character,' *United States v. Hendrix*, 505 F.2d 1233, at 1236, degenerates into a game of chance to the extent that a sentencing judge is deprived of relevant information concerning 'every aspect of a defendant's life.' *Williams v. New York*, 337 U.S. [241], at 250 [69 S.Ct. 1079 at 93 L.Ed. 1337]. The Government's interest, as well as the offender's, in avoiding irrationality is of the highest order. That interest more than justifies the risk that Grayson asserts is present when a sentencing judge considers a defendant's untruthfulness under oath.

438 U.S. at 53, 98 S.Ct. at 2617.

We see no reason to apply a different standard in the application of the due process clause of the Maine Constitution, Article I, section 6–A. The judges of Maine have been traditionally entrusted with broad discretion in sentencing. The particular statute involved here, 29 M.R.S.A. § 1312(10), authorizes the judge to exercise discretion in sentencing. In *State v. Samson*, Me., 388 A.2d 60 (1978), we suggested various factors that the judge may properly consider in sentencing in order to carry out the purposes of punishment set forth in the Maine Criminal Code (17–A M.R.S.A. § 1151). Those factors include the defendant's criminal record, history of undesirable behavior

patterns, remorse, repentance and cooperativeness, and receptivity to rehabilitation.

■ A defendant's degree of respect for truth, as manifested by his testimony at trial, is one component of his general attitude toward other persons and hence has some relevance in predicting his response to efforts at rehabilitation. *United States v. Grayson, supra; United States v. Martinez-Navarro*, 604 F.2d 1184 (9th Cir. 1979); *United States v. Hendrix*, 505 F.2d 1233 (2d Cir. 1974); *Humes v. United States*, 186 F.2d 875 (10th Cir. 1951). As a practical matter, the sentencing judge will almost certainly consider that factor, among others, in deciding on the defendant's sentence. It would be an unwise rule that constrained him to do so *sub silentio. United States v. Grayson, supra*, 438 U.S. at 54, 98 S.Ct. at 2618.

Appellant contends that the facts of this case are distinguishable from those in *Grayson* on the ground that there was direct evidence that Grayson testified falsely at trial. However, in the record on appeal, defendant has caused to be excluded from the trial transcript the testimony of all defense witnesses except that of defendant himself. As a result of that exclusion, there is no adequate basis for our review of all the evidence possibly bearing on the justice's conclusion that defendant and his witnesses lied on the stand. Without a more nearly adequate record, we cannot assess on direct appeal whether, as defendant contends, the statement of the trial judge establishes so plainly as to foreclose rational disagreement that he based his finding of perjury solely on his opinion of the likely effect of defendant's drinking during the evening in question. *State v. Parker*, Me., 372 A.2d 570, 572 (1977). *See also State v. Rich*, Me., 395 A.2d 1123, 1133 (1978); *State v. Chesnel*, Me., 358 A.2d 381 (1976).

The entry is:

Judgment affirmed.

Appeal denied.

All concurring.