**STATE of Maine**

v.

**Richard ADAMS.**

Supreme Judicial Court of Maine.

Argued Nov. 9, 1982.

Decided March 2, 1983.

---

**5.** *But see Consolidated Mortgage Corp. v. American Security Insurance Co.,* 69 Mich.App. 251, 244 N.W.2d 434 (1976).

David M. Cox, Dist. Atty., Gary F. Thorne, Asst. Dist. Atty. (orally), Bangor, for plaintiff.

Hall, DeSanctis & Schultz, Michael P. Roberts (orally), Bangor, for defendant.

Before McKUSICK, C.J., GODFREY, NICHOLS, CARTER and WATHEN, JJ., and DUFRESNE, Active Retired Justice.

DUFRESNE, Active Retired Justice.

Defendant Richard Adams was arrested on May 21, 1982, and by complaint dated May 26, 1982, was charged with violating 29 M.R.S.A. § 1312–B (Supp.1982) for operating in the City of Brewer a motor vehicle while having 0.10% or more by weight of alcohol in his blood or while under the influence of intoxicating liquor. The District Court (Third District, Division of Southern Penobscot) granted the defendant's motion to suppress the results of a blood test administered shortly after the defendant's arrest. The State properly brought an interlocutory appeal to this court, pursuant to 15 M.R.S.A. § 2115–A (1980 and Supp.1982–83), to challenge the suppression order. Because we conclude that the trial judge incorrectly applied the law, we vacate his order and remand this case for entry of an order denying the defendant's suppression motion.

The trial judge found as fact that Richard Adams was "badly beaten" as was the officer during the arrest, and that he was taken to the station by police cruiser and to St. Joseph's Hospital by ambulance with a very badly swollen eye and some facial cuts in the mouth area. Between his injuries and his apparent intoxication, which the arresting officer observed and which furnished probable cause for his arrest, Adams "was not exactly in good physical and mental condition" upon his arrival at the hospital, so found the District Court judge. Officer James Curtis of the Brewer Police Department read Adams a so-called "implied consent form" at the hospital, information required by 29 M.R.S.A. § 1312(1) (Supp.1982–83).[1] At the officer's request, a nurse then took a blood sample from Adams; he was agitated and very upset at the time, but caused her no problem. Adams received no medical treatment for his injuries until after the blood sample was drawn. In his findings the District Court judge stated that "the defendant, Richard Adams, did not understand the reading of the consent form, did not know what the nurse was doing, ... and never knowingly consented to the test." For this reason, the District Court suppressed the results of the blood test performed on the sample drawn from Adams' arm at the hospital.

As a preliminary matter, we disagree with the defendant's assertion that the District Court judge erred in making the implicit or assumed factual finding that the defendant *did not refuse* to submit to the blood test when the nurse approached him to draw a blood sample. Factual findings of trial courts in criminal matters may be overturned on review only if they are "clearly erroneous." *See State v. Maier,* 423 A.2d 235, 240 (Me.1980); *State v. Chattley,* 390 A.2d 472, 478 (Me.1978); *State v. Walker,* 341 A.2d 700, 702 (Me.1975). *Cf.,* in civil matters, *Harmon v. Emerson,* 425 A.2d 978, 981 (Me.1981); *Dehahn v. Innes,* 356 A.2d 711, 716–17 (Me.1976). We have reviewed the transcript of the suppression

1. Subsection (1) of section 1312 requires the law enforcement officer who requests a blood-alcohol test to inform the motorist that, "if he fails to comply with the duty to submit to and complete a test ..., his license or permit to operate, his right to operate or his right to apply for or obtain a license will be suspended for 180 days, and the failure to comply with the duty to submit to a blood-alcohol test shall be admissible in evidence against him at any trial for operating under the influence of intoxicating liquor." The form read to Richard Adams by Officer Curtis contained the proper warnings, as well as additional information about the State's payment of the costs of the tests and the availability of test results.

hearing held in the District Court, and we conclude that there was ample evidence to support the judge's conclusion that, although Adams never knowingly consented to the blood test, neither did he refuse, by word or by deed, to be tested.

■ The critical issue in this case is, whether a motorist arrested on probable cause for operating under the influence, who due to injury and/or intoxication may not understand that he can choose to take or refuse a blood test and who fails to refuse it by affirmative and unequivocal language or demeanor, is entitled to have the results of his blood test suppressed at trial. We answer in the negative.

Resolution of our problem requires an insight into the historical background of the legislation covering the operation of motor vehicles by persons under the influence of intoxicating liquor. Our Court, in *State v. Demerritt,* 149 Me. 380, 386, 103 A.2d 106, 110 (1953), had already stated that

> the ... 'blood test statute' gives a respondent no 'privilege'. Any person can have a blood test at any time, and the result can be testified to in court under the common law as a scientific fact. So can any relevant fact be testified to in the trial of a case, if not otherwise inadmissible by some rule of exclusion. (citations omitted). The statute itself recognizes this and gives no privilege.... The only privilege given by the statute (if in fact a statute is necessary to give it) is, that a failure to permit a blood test to be made, is not evidence against an accused.

Indeed, the statute originally expressly provided (*see* 29 M.R.S.A. § 1312, 1964 revised edition):

> The court may admit evidence of the percentage by weight of alcohol in the defendant's blood at the time alleged, as shown by a chemical analysis of his breath, blood or urine.

> *       *       *       *       *       *

> All such tests made to determine the weight of alcohol in the blood shall be paid for by the county wherein the violation of this section was alleged to have occurred. The failure of a person accused of this offense to have tests made to determine the weight of alcohol in his blood shall not be admissible in evidence against him.

The 1969 Legislature introduced in this area of the law the *"implied consent"* concept, *i.e.* "any person who operates a motor vehicle or attempts to operate a motor vehicle within this State *shall be deemed to have given consent* to a chemical test of the blood alcohol level of his blood ... for the purpose of determining the alcoholic content of his blood ...." (Emphasis additional). At the same time, the admissibility of test results as evidence was couched in mandatory terminology in substitution for the existing permissive language of the statute, which was changed specifically to reflect the new conceptual duty of motorists to submit to such tests, the new section reading:

> *9 Evidence.* The court *shall* admit evidence of the percentage by weight of alcohol in the defendant's blood at the time alleged, as shown by a chemical analysis of his blood or urine. (Emphasis ours).

Where it deliberately amended that aspect of the statute by striking out *"may"* and inserting "shall" in lieu thereof, the Legislature manifestly intended to show that the directory feature of the law, as it then existed, regarding the admissibility of blood-alcohol tests in evidence was being altered from its optional and permissive character to impose general legal admissibility of such tests. *See Talbot v. Board of Education,* 171 Misc. 974, 14 N.Y.S.2d 340, 347 (1939). As stated in *Hann v. Merrill,* 305 A.2d 545, 549 (Me.1972), in most jurisdictions the word "shall" in the construction of statutes is deemed to be imperative and mandatory and not merely directory and permissive.

Notwithstanding this general admissibility clause respecting blood-alcohol tests, the 1969 "implied consent" legislation so-called in subsection 1 of the Act expressly provid-

ed that such blood-alcohol tests *shall be inadmissible as evidence* in any proceeding *before any* administrative officer or *court* of this State, if the law enforcement officer fails to comply with certain prerequisites to the taking of any test. Before any test specified is given, subsection 1 provided, the law enforcement officer shall inform the arrested person of his right to have a similar test or tests made by a physician of his own choosing, afford him an opportunity to request such additional test and inform him of the consequences of his refusal to permit a test at the direction of the law enforcement officer. Subsection 2 of that same legislation mandated that, if a person under arrest *refuses* upon the request of a law enforcement officer to submit to one of the tests, *none shall be given,* but at the same time subjected the refusing motorist to suspension of his license or privilege to operate a motor vehicle at the hands of the Secretary of State, the administrative officer of this State in these matters.

In 1971, when it replaced the urine test with the breath test, the Legislature reenacted the reference subsections 1, 2 and 9, except that the only prerequisites to the test, as provided in subsection 1, were that the law enforcement officer shall inform the arrested person of the consequences of his refusal to permit a test at the direction of the law enforcement officer.

In 1979, the Legislature enacted an "Act Amending Criminal Laws and Procedures" (see P.L.1979, c. 701). This legislation purported to change the law in the area of the issue presented in the present case. The previously stated subsection 1 was repealed and the following enacted in its place:

1. Prerequisites to tests. Before any test specified is given, the law enforcement officer shall inform the arrested person that if he revokes his implied consent to a chemical test by refusing to permit a test at the direction of the law enforcement officer, his license will be suspended for 90 days or more, and the revocation of consent shall be admissible in evidence against him at any trial for operating under the influence of intoxicating liquor.

*No test results shall be excluded as evidence in any proceeding before any* administrative officer or *court of this State* as a result of the failure of the law enforcement officer to comply with this prerequisite. The only effects of the failure of the officer to comply with this prerequisite shall be as provided in subsections 2 and 8. (See P.L.1979, c. 701, § 32). (Emphasis added).

Thus, the 1979 Legislature made admissible in evidence test results which, prior thereto, it had expressly excluded for failure of law enforcement officers to give the prescribed warnings prior to the taking of the tests.

Effective April 15, 1982, the Legislature passed clarifying legislation respecting the comprehensive group of Acts recently enacted by it and designed to strengthen the laws of the State in preventing persons under the influence of intoxicating liquor from operating vehicles on the highways of this State. This legislation in pertinent part modified the language of section 1312 of title 29: the first paragraph was couched in terms such as—that the motorist shall have the duty to submit to a test—rather than—shall be deemed to have given consent to a test. Further added to the paragraph was the following language: The duty to submit to a blood-alcohol test includes the duty to complete either a blood or breath test. The several other sections of the law relating to the motorist's revocation of his implied consent to a test were reenacted, but in the new linguistic style of the motorist's failure to comply with the duty to submit to and complete a test to determine the level of blood-alcohol.

From our analysis of the total legislation relating to the operation of motor vehicles by persons under the influence of intoxicating liquor, it is our opinion that the Legislature has established a firm general policy of admissibility of blood-alcohol tests in its battle against the potential highway killer, the driver under the influence. The duty to submit to a blood alcohol test was the basic

concept around which from the beginning the implied consent law was developed. But this duty to submit to a blood test was never made absolute. From the start the Legislature provided that

> [i]f a person under *arrest* [now—as to whom there is probable cause] *refuses* upon the request of a law enforcement officer *to submit* to one of the tests as provided in this section [now—fails to comply with the duty to submit to a test to determine his blood-alcohol level by analysis of his blood or breath, upon the request of a law enforcement officer], none shall be given [now—no test may be given]. (Emphasis additional). (See P.L. 1969, c. 439, 29 M.R.S.A. § 1312(2), compared with 29 M.R.S.A. § 1312(2), P.L. 1982, c. 679, § 15).

We note that the Legislature has decreed, as a specific penalty for an operator's failure to comply with the duty to submit to a test, the summary suspension administratively of his license or of his right to apply for or obtain a license for the period of 180 days. P.L.1982, c. 679, § 15. Having in mind the firm legislative policy that, generally speaking, blood-alcohol test results are admissible in evidence,

> —[t]he percentage by weight of alcohol in the defendant's blood at the time alleged, as shown by the chemical analysis of his blood or breath, or by results of a self-contained, breath-alcohol testing apparatus authorized by subsection 6, shall be admissible in evidence (29 M.R.S.A. § 1312(8))—

we hold that, once it is established that there exists probable cause to believe a person has operated or attempted to operate a motor vehicle while under the influence of intoxicating liquor, and once that person is informed by a law enforcement officer of the tests available to him for selection and designation, unless that person *affirmatively and actually refuses* to be tested, either verbally or by conduct, the

percentage by weight of alcohol in that person's blood as shown by the chemical analysis of his blood or breath, *i.e.* the test results, is admissible in evidence, notwithstanding that, if based on a knowing consent theory, there might not be a knowing failure to comply with the mandatory duty to submit, due to that person's injury or intoxication.

Our ruling does not rest on the mere change of statutory terminology. True, the current wording of section 1312, imposing on motorists a "duty to submit" to a blood-alcohol test, is a variation in the language of the law. Until April 15, 1982, section 1312 stated that all motorists in Maine "shall be deemed to have given consent" to the performance of a blood-alcohol test. But the amendment, effected by P.L.1981, c. 679, §§ 12–28, was not intended to make any substantive change in the law; rather, it was the Legislature's intent to clarify the meaning of the statute in the light of the Law Court's decision in *State v. Plante,* 417 A.2d 991 (Me.1980). See L.D. 2138, § 12 & Statement of Fact (110th Legis.1982).[2] Thus, *Plante* and earlier cases construing the old section 1312 may still furnish valuable guidance in our attempt to articulate the limits of a motorist's duty to submit *to* a blood-alcohol test.

In *Plante,* the defendant was arrested for operating under the influence and an "implied-consent" form was read to him. The arresting officer also gave the defendant some free advice: to take the test, as the case against him would be dropped if the test results showed a blood-alcohol level below 0.10 percent. The defendant agreed to have a blood test performed, but then moved to have the results of that test suppressed, arguing that his consent to the test had not been voluntary. The Law Court rejected this claim, stating that although a motorist has the "power" to refuse a test, section 1312 "does not require affirmative

---

**2.** The "Statement of Fact" included in a Legislative Document prepared for Maine's lawmakers is "a proper and compelling aid to ascertaining the legislative purpose and intent" of the law when enacted. *Franklin Property Trust v. Foresite, Inc.,* 438 A.2d 218, 223 (Me. 1981). *See also Mundy v. Simmons,* 424 A.2d 135, 137 (Me.1980).

consent to testing by the arrested person" in order to bring the evidentiary provisions of the statute into operation. 417 A.2d at 993. Earlier cases are in accord. *State v. Van Reenan,* 355 A.2d 392 (Me.1976) held that,

> an arrested driver has no *right* to deny the State the use of the specimen for the test which the Legislature has determined to be required of all citizens so arrested. The Legislature has simply made a policy decision that upon an arrested driver's refusal to submit to the test, the State should forego the use of force to obtain the specimen and, instead, should rely upon the sanction of suspension to persuade arrested drivers to submit and to influence other drivers to maintain sobriety.

355 A.2d at 395 (emphasis in original). And in *State v. Shepard,* 323 A.2d 587, 588 (Me. 1974), we stated that "no additional consensual affirmative decision is required when a motor vehicle operator lawfully arrested . . . is directed to submit to such a test." [3]

Our conclusion today, that a motorist's claimed inability to comprehend the required warning does not vitiate the rule that he must affirmatively and actually refuse the test by word or conduct in order to come within the subsection (2) exception, stems primarily, as stated previously, from our understanding of the legislative policy sought to be advanced through section 1312. As we explained in *Van Reenan, supra,* the Legislature has given a motorist the power to refuse a blood-alcohol test, because it did not want law-enforcement officers to use force to obtain those tests. Ordinarily, it is only when the motorist explicitly states or demonstrates his unwillingness to be tested

that force will have to be used to perform the test. Where the motorist neither consents to the test nor refuses it, as the trial judge found to be the case here, the Legislature's aversion to the use of physical force does not require that testing be foregone.

Our conclusion in this case is further strengthened by practical considerations: if motorists could successfully claim that they are exempt from the duty to submit to blood-alcohol tests whenever their intoxication renders them incapable of comprehending the choice they are presented with under the statute, that duty quickly becomes a fiction. Section 1312 applies only to persons as to whom there is probable cause to believe they are under the influence. The same evidence used by the State to establish probable cause could be then used by the motorist to support his claim that he was incapable of making an informed choice between submitting to and refusing a blood-alcohol test. The Legislature, in enacting section 1312, could not have contemplated such a bizarre result. *See State v. Rand,* 430 A.2d 808, 817 (Me.1981).

■ Defendant's argument, both in the District Court and on appeal, focused solely on section 1312. The question, whether the fourth amendment to the United States Constitution requires the test results to be excluded, must therefore be considered waived. In any event, *Schmerber v. State of California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), held that a blood test performed under sanitary and humane conditions may be used in evidence against a defendant where, as here, the law enforcement officer requesting the "search" had no warrant but did have probable cause to believe that the defendant's blood contained

3. *Plante, Van Reenan,* and *Shepard* all refer to an *arrested* motorist's duty to submit (or "implied consent") to a blood-alcohol test. P.L. 1981, c. 475, § 2 amended § 1312 so that it now applies to persons as to whom "there is *probable cause to believe* he has operated or attempted to operate a motor vehicle while under the influence of intoxicating liquor." Prior to the September 18, 1981 effective date of c. 475, § 2, the statute applied to all persons "arrested for operating or attempting to oper-

ate a motor vehicle while under the influence of intoxicating liquor." This change does not affect our analysis of Richard Adams' blood-alcohol test obligations, as he had been arrested, on probable cause, for operating under the influence at the time his blood was drawn to be tested. We do not understand Adams to argue that the arresting officer had acted without probable cause when he placed Adams under arrest.

relevant evidence of his crime, and where the nature of the evidence was such that it could be expected to disappear unless the search was concluded quickly. Because the alcohol content of human blood diminishes as time passes (as long as no new alcohol is introduced into the system), it may be "searched" for without a warrant on probable cause. *See State v. Libby,* 453 A.2d 481, 485, n. 4 (Me.1982). Defendant Adams has made no claim that his arrest or blood test was invalid due to lack of probable cause, nor has he argued that his blood was drawn in an impermissibly ungentle manner. It was certainly not "obvious error" for the District Court judge to find no fourth amendment violation in the events that occurred at St. Joseph's hospital.

The entry will be:

The order of the District Court suppressing the results of Richard Adams' blood test is vacated. The case is remanded to the District Court for entry of an order denying Adams' suppression motion and for further proceedings consistent with the opinion herein.

All concurring.