**STATE of Maine**

**v.**

**Michael H. AYOTTE.**

Supreme Judicial Court of Maine.

March 3, 1975.

Lawrence J. Zuckerman, G. Arthur Brennan, Asst. Attys. Gen., Portland, for plaintiff.

Caron, Ayotte & Caron, by Ronald E. Ayotte, Saco, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

The Defendant, who was convicted in the Superior Court of operating a motor vehicle while under the influence of intoxicating liquor, had moved before trial that the complaint against him be dismissed on the ground that

"he was denied the right to a blood test to determine his blood alcohol level after having requested a test following his arrest . . . ."

After hearing, his motion was denied. The Defendant then went to trial and was convicted.

The only questions raised by his appeal are whether the evidence presented at the hearing on his motion was such as to compel a conclusion that the conduct of the arresting officers effectively deprived him of the opportunity to have a test of his blood administered as guaranteed him by 29 M. R.S.A., § 1312, and that in its totality, this conduct denied him due process under the law.[1] In short, was the Justice clearly erroneous in denying the Defendant's motion to dismiss before trial?

We believe that he was not and we deny the appeal.

The testimony presented at the hearing on the motion would have justified the Justice in finding these facts:

Sometime in the evening of October 22, 1972, two officers of the Maine State Police arrested the Defendant on Route 5

---

1. Me.Const., art. I, § 6–A; U.S.Const., amend. V.

near the Country Club in Saco. The Defendant, who was then 20 or 21 years old, was placed in the police cruiser and the officers explained to him his rights under the Miranda doctrine and under 29 M.R.S.A. § 1312, our implied consent law. He was unknown to the officers. He refused to give his name to the officers, furnished no identity, could produce no driver's license or registration for the car but told the officers he had "borrowed" the car, that it belonged to his mother, that his father was dead. At one point the officers were unable to control the Defendant physically and he "broke arrest" (in a manner not described by the record) and was subsequently handcuffed by them.

During this time the officers sought and learned by radio the name of the owner of the car. The owner proved to be the then County Attorney of York County. The officers suspected that the Defendant might be the County Attorney's son but when they inquired as to this the Defendant answered that his father was dead. At about this time another automobile appeared and parked parallel to the cruiser and the Defendant shouted to the driver, a young acquaintance, "Go get my father." This young man drove to the Country Club, 50 yards away, expecting to find the Defendant's father there but he found the Club closed. He returned to the police cruiser. At the officers' request he then took home a passenger in the Defendant's car, a young man who was not under arrest.

The Defendant responded to the officers' explanation of the implied consent law by demanding a blood test. The officers suggested having Dr. Fortier of Saco extract the blood sample and the Defendant agreed but also told them any doctor of their choice would be satisfactory to him.

The officers radioed the Scarboro barracks to ascertain if Dr. Fortier would be available to extract the specimen. While the police were on the way to the Saco police department with the Defendant, they were told by radio that Dr. Fortier was not available but that Dr. Richards of Alfred would be available. The officers then continued on past Cutts Avenue (on which the Saco police station is located) and headed toward Alfred. The Defendant then told the officers that he did not want a "blood test, breath test or anything," that he did not want to go to Alfred and he wanted to be released on bail in Saco. The officers told the Defendant that until he disclosed his identity he would not be able to obtain bail, and that in the meantime they would have to detain him in the County jail at Alfred.[2]

It is the Defendant's contention, first, that he was denied the opportunity to have a test of his blood administered by a physician of his own choice which he says is assured him by our implied consent statute.

Our present statute, 29 M.R.S.A. § 1312, prohibits driving while intoxicated or under the influence, and creates standards defining prima facie proof of intoxication based upon certain blood-alcohol levels. Some analysis of this statute and the background against which its predecessor and it were enacted is necessary in determining what relevant rights it gave this Defendant.

P.L.1969, ch. 439, which was the predecessor of our present statute, established that an operator of a motor vehicle within the state, if arrested for a drinking-driving violation, should be deemed to have consented to a chemical test of his blood or urine. The arrested person was authorized

---

2. Alfred is the County seat of York County and the site of the York County jail. Its distance from Saco is described as "Ten or fifteen miles. Somewhere in that vicinity. Maybe more . . . ." There is a municipal police station in Saco. One of the State Police officers said that they do use the local police departments often

"[u]nless we run into circumstances where a person cannot obtain bail, or is unable to furnish bail. Then we have to, in turn, take them to the county jail."

What, if any, facilities exist at the Saco police department for detention of prisoners does not appear in the record.

to designate which of the two tests should be administered, and sanctions were provided in the event he refused to submit to one of the tests. This original statute added a provision permitting the arrested person to have a second test performed by a physician of his own choice, at state expense.

P.L.1969, ch. 439 was repealed during the next legislative session and replaced by a statute of similar import, P.L.1971, ch. 547, with which we are now concerned. The new statute refers to tests of blood or *breath* and eliminates the second at-state-expense test. Our interest concerns the following language:

"Any person who operates or attempts to operate a motor vehicle within this State shall be deemed to have given consent to a chemical test to determine his blood-alcohol level by analysis of his blood or breath, if arrested for operating or attempting to operate a motor vehicle while under the influence of intoxicating liquor.

He shall be informed by a law enforcement officer of the tests available to him, and said accused shall select and designate one of the tests. At his request he may have a test of his blood administered by a physician of his choice, if reasonably available." *29* M.R.S.A. § 1312.

■ It was made clear long before the implied consent law became a part of our drinking-driving statute that a person who is under arrest and charged with operating while under the influence of liquor is entitled, under due process of law, to have a reasonable opportunity, consistent with safe custody, to procure the seasonable taking of a blood sample for test purposes. State v. Munsey, 152 Me. 198, 127 A.2d 79 (1956).

Prior to enactment of the implied consent law, the State had no parallel right of obtaining a blood-alcohol test against the Defendant's wishes.

■ The overall purpose of the implied consent law was to increase the availability of reliable evidence as to the true state of a driver's sobriety. A specific purpose was to induce reluctant arrested drivers to submit to one of two statutorily approved methods of determining their blood-alcohol level by providing sanctions in the nature of license suspensions for refusal to submit to such a test.

While the statute was intended to strengthen law enforcement, it was structured to achieve this purpose without departing from basic fairness.

■ The new statute becomes operative only when the officer explains the Defendant's rights of choice between blood test and breath test (and the consequences of refusal). It permits the defendant to choose which of the compelled tests he will undergo, and, if he chooses the blood test, permits him to have the specimen withdrawn by a physician of his own choice, if that physician is reasonably available. This latter right places the police under no obligation to obtain a particular physician for a defendant but the statute anticipates police cooperation in this respect consistent with security and with other police responsibilities. However, the effect of the law is not to guarantee that facilities will always be available for one of these tests of an arrested person. We need go no further in examining the Defendant's claim of denial of right under the statute. It is undisputed that the Defendant chose to take a blood test after having his rights explained, but that he made no request that it be taken by a particular physician. He later refused to submit to any kind of a test and never again requested one.

We see nothing in the record revealing a denial of statutory rights.

■ The Defendant also contends that the conduct of the officers in its entirety was designed to result—and did result—in removing him from his home area where he could receive the advice of his parents,

and especially of his attorney father, where he could promptly be admitted to bail and where his family physician could have been obtained to extract the blood specimen—all amounting, he says, to a denial of due process. His position as to this was summarized by a question his trial counsel asked the arresting officer on cross-examination:

"And the purpose of getting him up to Alfred was to get him away from advice he might get in the Saco jail. Is that right?"

The officer denied that this was his purpose. The record does not compel a conclusion that such was his purpose. The Justice could properly have found from the testimony that the arresting officer originally intended to take the Defendant to the Saco police department to facilitate the taking of the blood specimen by the Saco physician, with no determination having yet been made as to whether the Defendant would be detained there pending trial or bail; that he then decided to take the Defendant to the County jail in Alfred because he learned that the Saco doctor was unavailable but that the Alfred doctor would be available; that when the Defendant announced that he would not take any test to determine his blood-alcohol content and that he wanted to be released on bail in Saco he continued on to Alfred because of (1) security considerations as to the prisoner who had already once broken arrest, (2) the inappropriateness of bail for a prisoner who could not yet be identified, and (3) the availability of the Alfred doctor in the event the Defendant again changed his mind and requested a blood test.

The Justice who denied Defendant's motion apparently saw no sinister purpose in the officers' taking the Defendant to Alfred or any denial of due process, that is, governmental fair play, in their doing so. In re John M. Stanley, 133 Me. 91, 95, 174 A. 93, 95 (1934) (aff'd Stanley v. Public Utilities Comm. of Maine, 295 U.S. 76, 55 S.Ct. 628, 79 L.Ed. 1311 (1935)).

Any suspicion that the officers intended to put the Defendant in a place where he could not exercise his constitutional rights to counsel, bail or reasonable opportunity to gather evidence seems to be dispelled by the facts of the case.

The Defendant, a substitute school teacher, had recently reached or was soon to reach his 21st birthday. The Defendant can hardly complain that the officers did not inform his parents of his predicament and give him opportunity to confer with his attorney father since the Defendant refused to divulge his identity and insisted that his father was dead. There is no constitutional right per se to advice of counsel before consenting or refusing to take a blood test (State v. Stevens, Me., 252 A.2d 58 (1969)) and no particular circumstances demanded it here. In fact, he never requested counsel although he had been told of this right. The officers had set in motion the police machinery which revealed the name of the owner of the car and which the police certainly knew would promptly inform the owner of the location of his car and driver (who turned out to be his son). In fact, the record shows that the Defendant's parents arrived at the County jail soon after the Defendant was lodged there, still refusing to identify himself. The Defendant was again offered—and again refused—a blood test in Alfred. Reasonable discretion, commensurate with both security on the one hand and fairness on the other must be allowed police officers in their decision as to in which governmental place of detention an arrested person should be temporarily restrained pending bail or trial under the particular circumstances existing. There is no absolute right in the arrested person to have a blood specimen withdrawn in a town of the person's choosing. Minor inconvenience to a Defendant will not outweigh the public interest in the discharge of governmental responsibilities.

The officers appear to have been entitled to assume that a person who refused to identify himself would not be admitted to bail in the immediate future and that security considerations plus the known availability of a physician indicated that his temporary detention be at the County jail. While the officers suspected the Defendant might be one of the County Attorney's sons, the Defendant had denied this and the officers were under the duty to lodge the Defendant in a safe and appropriate place of detention until he was released on bail or brought to trial. Under all the circumstances it does not appear that their choice of the County jail was an unreasonable one.

The Justice found no denial of due process. Neither do we.

The entry will be:

Appeal denied.

All Justices concurring.