**STATE of Maine**

v.

**Frederick COPELAND.**

Supreme Judicial Court of Maine.

Oct. 5, 1978.

David M. Cox, Dist. Atty., Gary F. Thorne, Asst. Dist. Atty. (orally), Bangor, for plaintiff.

---

1. *But compare Michaud v. Inhab. of Town of Livermore Falls*, Me., 381 A.2d 1110 (1978).

Harold C. Hamilton, II (orally), Bangor, Sharma Trager, Law Student, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, DELAHANTY, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Defendant Frederick Copeland appeals from a Superior Court conviction in Penobscot County for operating a motor vehicle under the influence of intoxicating liquors in violation of 29 M.R.S.A. § 1312(10). His sole ground for appeal is his claim that the conduct of the Bangor police deprived him of his due process and statutory right to a blood test, which might have tended to exculpate him. We deny the appeal.

Bangor Police Officer Welch arrested Copeland at about 5:15 a. m. on Sunday morning, October 23, 1977. At the police station, officers informed Copeland of his rights under the motorist's implied consent law, 29 M.R.S.A. § 1312.[1] Copeland requested a blood test. In accordance with the standard procedure of the Bangor Police Department, Officer Welch then took Copeland to St. Joseph's Hospital. On arriving at St. Joseph's Copeland told Welch that he was an adherent of osteopathic medicine and that he wished to be taken to the James A. Taylor Hospital instead. Though Officer Welch refused to take him there on the ground that the police department's standard operating procedure dictated use of the facilities at St. Joseph's, Welch did undertake to find an osteopathic physician to draw defendant's blood. Welch called four or five physicians selected by Copeland from the telephone directory but failed to obtain their services. Only after this diligent, good faith effort to secure an osteopathic physician for Copeland did Officer Welch attempt to convince defendant to let St. Joseph's Hospital personnel draw his blood.

The attending nurse who would have drawn Copeland's blood told him that he was required to sign a printed hospital liability release, which purported to absolve the hospital from any liability whatsoever which might result from the blood drawing procedure. Copeland was reluctant to sign the release, but after being informed that failure to submit to the test would automatically result in a three-month suspension of his driving privileges, he agreed to sign. However, before signing his name, Copeland added a written comment to the form, reading "person had no signed I.D. saying she had right to draw blood from me." As soon as the nurse observed the language added by Copeland, she refused to draw his blood, treating the inscription as a limitation upon the required unqualified release. Officer Welch informed Copeland that the added language made it impossible for St. Joseph's personnel to take a sample of his blood. Thereupon, officer Welch transported Copeland back to the police station and no blood test was ever performed. Defendant was convicted on evidence other than the results of any alcohol test.

As this court said in State v. Ayotte, Me., 333 A.2d 436, 439 (1975), the motorist's implied consent law does not guarantee that facilities will always be available for intoxication tests for the benefit of arrested persons. On the other hand, once the defendant has elected to take the blood test under the statute, the police, "consistent with security and with other police responsibilities," are obliged to cooperate in assisting him to procure his selected test. Id. at 439. Compliance with this police obligation arising from the implied consent statute will at

[1] The implied consent law provides in part:
"Any person who operates or attempts to operate a motor vehicle within this State shall be deemed to have given consent to a chemical test to determine his blood-alcohol level by analysis of his blood or breath, if arrested for operating or attempting to operate a motor vehicle while under the influence of intoxicating liquor.

"He shall be informed by a law enforcement officer of the tests available to him, and said accused shall select and designate one of the tests. At his request he may have a test of his blood administered by a physician of his choice, if reasonably available."

the same time satisfy the due process requirements declared in *State v. Munsey*, 152 Me. 198, 201, 127 A.2d 79, 81 (1956), long prior to the enactment of the statute, that the arrestee be accorded "a reasonable opportunity, [consistent with safe custody] . . . to procure the seasonable taking of a blood sample for test purposes."

■ This case, which was tried to a jury in March of this year, is controlled by our decision certified on April 11, 1978, in *State v. Deering*, Me., 384 A.2d 447 (1978). In the case at bar, defendant did ask to be taken to another hospital from St. Joseph's, but nothing appears in the record to indicate the other hospital would have drawn his blood at that hour early Sunday morning. Furthermore, in this case the arresting officer went to considerable length, at defendant's request, to try to find an osteopathic physician to draw his blood. As in *Deering*, *id.* at 449, we find no violation of defendant's statutory or constitutional rights on the facts of the present case. The police officer appropriately cooperated with this defendant in an attempt to get a blood test, as he was required to do by the statute, and he *a fortiori* "afforded [defendant] the reasonable opportunity [to attempt to procure a blood test] to which he was entitled as a matter of fair play." *State v. Munsey*, *supra*, 152 Me. at 204, 127 A.2d at 83.

■ The trial justice submitted to the jury the due process question whether the police had done "anything to affirmatively prevent [defendant] from obtaining exculpatory evidence" or whether there was "any reasonable doubt that [defendant] was accorded governmental fair play." This was a mistake. The due process issue went to the very root of the prosecution. It was inappropriate to call upon the jury to consider and determine whether or not governmental misconduct barred the prosecution from going forward.[2] Due process issues involving alleged police interference with the efforts of a defendant to gather exculpatory evidence are to be heard and decided by the court, not by a jury. *State v. Couture*, 156 Me. 231, 248, 163 A.2d 646, 655 (1960); *cf. State v. Collins*, Me., 297 A.2d 620, 631–36 (1972).[3]

The reasons for entrusting the trial justice, rather than the jury, with this responsibility were well stated by Justice Webber:[4]

"He [a juror] has not been schooled by legal training to concern himself with the methods by which guilt is shown. He tends understandably to resist the concept that the man who is obviously guilty must nevertheless go free unless his guilt

---

**2.** Courts in other jurisdictions have discussed the impropriety of submitting similar constitutional questions to juries.

Referring to the defense of entrapment in a concurring opinion representing the views of himself and Justices Brandeis and Stone, Justice Roberts wrote: "It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. . . ." *Sorrells v. United States*, 287 U.S. 435, 457, 53 S.Ct. 210, 218, 77 L.Ed. 413 (1932) (Roberts, J., concurring).

A number of courts have held that a claim of discriminatory enforcement of the law, in violation of the equal protection clause, should be decided by the trial court, and not submitted to juries:

"The claim of discriminatory enforcement should not be treated as a defense to a criminal charge, to be tried before the jury and submitted to it for decision, but should be treated as an application to the court for a dismissal or quashing of the prosecution upon constitutional grounds. Insofar as a question of fact may be involved, the court

should take evidence in the absence of the jury and should decide the question itself." *People v. Utica Daw's Drug Co.*, 16 A.D.2d 12, 18, 225 N.Y.S.2d 128, 131–32 (1962). *See also United States v. Berrigan*, 482 F.2d 171 (3rd Cir. 1973); *Murgia v. Municipal Court*, 15 Cal.3d 286, 124 Cal.Rptr. 204, 540 P.2d 44 (1975).

**3.** Anything to the contrary said in *State v. Munsey*, 152 Me. 198, 203–04, 127 A.2d 79, 82–83 (1956), must be considered rejected.

**4.** Similarly, Justice Frankfurter observed that in order to resolve due process issues, judges must be endowed with special characteristics not shared by laymen:

"To practice the requisite detachment and to achieve sufficient objectivity no doubt demands of judges the habit of self-discipline and self-criticism, incertitude that one's own views are incontestible and alert tolerance toward views not shared." *Rochin v. California*, 342 U.S. 165, 171, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

can be demonstrated by legally admissible evidence lawfully obtained. It is reasonable to hope and believe that one trained in law and fortified by judicial experience can more readily insulate his mind from the near certainty of guilt and make a dispassionate judgment as to the methods by which the blood test evidence was obtained." *State v. Merrow*, 161 Me. 111, 121, 208 A.2d 659, 664 (1964) (Webber, J., concurring.)

 Although the question whether defendant's due process rights were violated should not have gone to the jury, that error avails defendant nothing on appeal. By its guilty verdict the jury answered that question in the negative. The circumstances of this case, where there is no dispute as to the pertinent facts, compelled that answer—whoever was to decide the question. Thus, the conviction in this case was unaffected by the misallocation of function between the judge and the jury.

The entry must be:

Appeal denied.

Judgment affirmed.

ARCHIBALD, J., did not sit.