STATE of Maine

v.

Stanley McCONVEY.

Supreme Judicial Court of Maine.

Argued March 17, 1983.
Decided April 26, 1983.

Michael Povich, Dist. Atty. (orally), Machias, for plaintiff.

Brown, Tibbetts, Churchill & Romei, Robert E. Tibbetts (orally), Calais, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ.

CARTER, Justice.

The defendant, Stanley McConvey, appeals a judgment of conviction on two counts of vehicular manslaughter, Class C, 17–A M.R.S.A. § 203(3) (1983) entered after a jury trial in Superior Court, Washington County. We address the defendant's contentions that (1) his second trial was barred by principles of double jeopardy and that (2) the presiding justice erred in admitting, as part of the State's rebuttal, the blood-alcohol test results allegedly obtained in violation of 29 M.R.S.A. § 1312 (1978). We affirm the judgment of the Superior Court.

A two-car collision which occurred on February 1, 1981 on Grand Lake Stream Road in Washington County resulted in the death of William and Annette Goode, the driver and the passenger of one of the cars. The defendant, Stanley McConvey, the driver of the other car, was subsequently indicted for two counts of vehicular manslaughter, Class C, 17–A M.R.S.A. § 203(3). On January 18, 1982, the first jury trial commenced. On January 21, 1982, at 12:52 p.m., the Superior Court charged the jury and sent it to deliberate.[1] At 6:55 p.m.,

---

1. We have had concern as to whether the excerpted transcript of the trial proceedings from the time the jury commenced its deliberations to the time the mistrial was declared was properly a part of the record before the motion justice or is a proper part of the record on appeal. The transcript was not certified by the reporter as an accurate transcription of her stenographic notes. If it is not a proper part of the record, there is serious question as to whether the State has carried the burden of proof imposed upon it by *State v. Linscott,* 416 A.2d 255, 259 (1980).

In *Linscott,* we said that upon the defendant making a "prima facie showing of the applicability of the double-jeopardy provision of the State and Federal Constitutions," the State has the burden to prove *at the motion hearing* the existence of a "manifest necessity" for the mistrial. 416 A.2d at 259. Here, as in *Linscott,* the State made no attempt *to prove* the existence of a manifest necessity. The uncertified transcript was never offered or admitted in evidence. The docket entries and the transcript itself reflect that it was filed with the

clerk on July 14, 1982. The hearing on the motion to dismiss occurred two days later. The transcript of that hearing reflects that the court had the uncertified transcript before it and was familiar with its contents. If the transcript had been properly certified by the reporter as accurate, the court could clearly have considered its contents even if it were not admitted in evidence simply by taking judicial notice of it. A court may take judicial notice of its own records in the case before it including all prior pleadings and adjudications in the same case when pertinent to any issue under consideration. *See Warren v. Waterville Urban Renewal Authority,* 290 A.2d 362, 367 (Me. 1972); *see also Reed v. Reed,* 118 Me. 321, 324, 108 A. 103, 104 (1919) ("court cannot shut its eyes to its own decisions and records" made in prior trial and review of same case).

The fact that the transcript has never been certified raises the potential concern that the transcript may not properly be the subject of judicial notice because its reliability has not been established. That concern is, however,

after deliberating for six hours, the jury returned for further instruction. The first note from the jury read: "We cannot reach agreement. What do we do now?" The second note read: "May we break for supper?" Addressing the foreman, the judge stated: "My inquiry to you is whether or not you feel you are hopelessly deadlocked or, if we had your evening meal brought in to you and you were to continue deliberations, you might be able to reach a unanimous verdict." The foreman replied: "Your honor, at this point, we are 11 to one, and the last one had stated he will not change his mind." The justice then ordered the jury to return to the jury room to have their evening meal. The justice also encouraged the jury to continue deliberations.

Two hours later, at 8:50 p.m., the jury returned with a third note which read: "Your Honor, we, the Jury, are hopelessly deadlocked, none of us willing to change our minds." The justice proceeded to poll each juror separately. Each juror stated that the jury was "hopelessly deadlocked." The justice then declared a mistrial. The justice asked counsel to make a statement for the record. Both the prosecutor and defense counsel stated that they had not requested the mistrial and that they did not consent to or agree to the mistrial. Addressing the court, the prosecutor asked: "More in the language of State versus Linscott, is the Court basing its finding on manifest necessity for the declaring of the mistrial?" The court replied: "It does so find."

The prosecutor rescheduled the case for a second trial. The defendant then filed a motion to dismiss the indictment based upon the allegation that the second trial violated the prohibition against double jeopardy. Also, at that time, the State filed a motion in limine seeking to have blood-alcohol test results admitted in evidence. Denying the motion to dismiss, the Superior Court reasoned that the double jeopardy

prohibition does not attach to a trial in which there is declared a mistrial by reason of manifest necessity. Addressing the motion in limine, the justice ruled that the test results were inadmissible as part of the State's case in chief in this second trial.

On July 26, 1982, the second trial began. The State's case in chief consisted of the testimony of the Chief of Police for the Indian Township Tribal Government, Norman D. Nicholson. The chief testified that the accident occurred at approximately 2:45 p.m. and that the defendant was immediately taken to the Calais Regional Hospital. The chief stated that when he arrived at the hospital at approximately 6:00 p.m., he found that the defendant was very irate and lucid and he noticed that the defendant was "smelling very strongly of alcohol." The chief further testified that he left the hospital and returned at approximately 7:30 p.m., at which time he found that the defendant was "still irate and still smelling strongly of alcoholic beverage." The chief stated that in his opinion the defendant was "highly intoxicated."

The State's case in chief also included the testimony of Mr. Barry Campbell, the licensed physician's assistant who attended the defendant. He also testified that the defendant was "greatly intoxicated." The State subsequently rested.

The defense introduced the testimony of two men, Francis Pike, Sr., and Samuel Clark, who were with the defendant during the evening of January 31 and during the morning of February 1, 1981. These men and the defendant were fishing at Grand Lake. They were all staying at Mr. Clark's camp. Mr. Pike and Mr. Clark testified that they saw the defendant have five or six drinks of rum and Coke during the evening of January 31. Mr. Pike and Mr. Clark both testified that they went to bed at 11:00 p.m. before the defendant did so.

stillborn because of defense counsel's continuous acquiescence in its use, both at the motion hearing and on appeal. No objection has been made either before the motion justice or on this

appeal to the utilization of the contents of the uncertified transcript to determine whether manifest necessity existed for the mistrial.

Mr. Pike testified that he saw the defendant drink a beer at noon on February 1. Mr. Pike further testified that the defendant was not under the influence of alcohol when the defendant left him at 1:30 p.m. on February 1.

The defense also consisted of testimony from Walter Durgin who saw the defendant during the early evening of January 31. Mr. Durgin further testified that when he saw the defendant on February 1, he took a few swallows of a drink of rum and Tab, a soft drink.

Finally, the defense called Robert Proulx, the ambulance attendant who took the defendant to the hospital. The attendant testified that at the scene of the accident the defendant had told him that he had drunk only a few beers. The attendant further stated that when he was close to the defendant's face, he could smell the odor of alcoholic beverage. The defense subsequently rested.

During rebuttal, the State requested that the blood-alcohol test be admitted in evidence. After hearing the voir dire testimony, the justice ruled that the test was admissible as rebuttal testimony. In making the ruling, the justice limited the testimony to a statement of the milligrams of alcohol per milliliter of blood, rather than a statement of a percentage of blood-alcohol content.

Mr. Campbell testified that at 8:15 p.m. the police department provided him with a vacutainer kit to perform a blood-alcohol test. He further stated that he then drew a sample of the defendant's blood. At the time Mr. Campbell drew the blood, he was not then certified by the State of Maine, Department of Human Services. Mr. Campbell explained that he did not know he had to have such certification. Mr. Campbell further testified that during his ten-year medical career, he had drawn from 10,000 to 20,000 samples of blood. While employed at the Calais Hospital, Mr. Campbell stated that he had used the vacutainer kit thirty to fifty times in administering the blood-alcohol test.

Dr. James Young, an analytical chemist, testified that there were 181 milligrams of alcohol for 100 milliliters of the defendant's blood. The prosecutor then asked the doctor if he had an opinion as to whether the five or six drinks consisting of rum and Coke plus the one beer that the defendant drank were consistent with the blood-alcohol level at 8:15 p.m. of 181 milligrams of alcohol for 100 milliliters of blood. The doctor replied that he did have such an opinion and it was that the evidence was inconsistent. The prosecutor then asked the doctor "what would you consider a consistent blood-alcohol level to have at 8:15 given not only that, but the time frame?" The doctor replied that it "should have been zero, zero, zero."

On July 28, 1982, the jury returned a verdict of guilty on both Counts I and II. On September 3, 1982, a judgment of conviction was entered on those counts. The defendant was sentenced to serve two years at the Maine Correctional Center with all but four months suspended as to each count.

## I. *Mistrial*

The defendant contends that the trial justice at the first trial erred in ruling that the jury was deadlocked justifying a mistrial by manifest necessity. The defendant, therefore, argues that the double jeopardy prohibition of article 1, section 8 of the Maine Constitution and fifth amendment of the United States Constitution attached during the first trial and therefore the second trial violated such a right.

The double jeopardy clause constitutes a general prohibition against the State's subjecting a defendant to a second trial. The double jeopardy proscription, however, does not bar further proceedings following a mistrial declared by manifest necessity based upon the trial justice's decision that the jury is unable to reach a verdict.[2] *United States v. Perez,* 9 Wheat.

---

**2.** The argument that a jury's inability to agree

establishes reasonable doubt as to the de-

579, 580, 6 L.Ed. 165 (1824); *Henderson v. Wright,* 533 F.Supp. 1373, 1375–76 (D.Me. 1982); *State v. Commeau,* 438 A.2d 454, 456 (Me.1981); *State v. Henderson,* 435 A.2d 1106, 1108 (Me.1981); *State v. Linscott,* 416 A.2d 255, 258 (Me.1980). The trial justice is permitted to exercise broad discretion in determining whether the jury is deadlocked.[3] *Henderson,* 435 A.2d at 1108; *Linscott,* 416 A.2d at 260. By granting a trial justice such discretion, the law seeks both to prevent a defendant from a deprivation of his right to a verdict from a particular jury and to protect a defendant against a verdict resulting from pressures which emerge during long and exhausting deliberations rather than from the jurors' collective judgment. *See Washington,* 434 U.S. at 509, 98 S.Ct. at 832, 54 L.Ed.2d at 730. The trial justice is in the best position to weigh all the considerations to determine whether the jury may reach an impartial verdict. *See United States v. Gordy,* 526 F.2d 631, 636 (5th Cir.1976), *cited in, Wash-*

*ington,* 434 U.S. at 510 n. 28, 98 S.Ct. at 832 n. 28, 54 L.Ed.2d at 731 n. 28. As a result, the trial justice's decision should be accorded great deference. *State v. Pierce,* 459 A.2d 148, 151 (Me.1983); *Henderson,* 435 A.2d at 1108; *Linscott,* 416 A.2d at 260.

This case comes to us as an appeal from the denial of a motion to dismiss the indictment prior to the second trial. We review the propriety of the ruling of the motion justice on the record made at the motion hearing. *Pierce,* 459 A.2d at 152; *Linscott,* 416 A.2d at 259. Here, that record reflects that the trial justice determined that the jury was unable to reach an impartial verdict and therefore declared a mistrial by manifest necessity. We must determine whether under the circumstances of this case the trial court abused its discretion in declaring the mistrial.[4]

We have previously set forth guidelines for determining whether the trial justice

---

fendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws.
*Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717, 730 (1978). In addition, if the defendant consents to the declaration of a mistrial by manifest necessity based upon the jury's inability to agree, he has waived his double jeopardy claim. *See State v. Linscott,* 416 A.2d 255, 260 n. 7 (Me.1980) (citing *State v. Small,* 381 A.2d 1130, 1132 n. 3 (Me.1978)).

3. The law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any

of the changes of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of his discretion rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of offices.
*Perez,* 9 Wheat. at 580, 6 L.Ed. at 165.

4. Many jurisdictions review the declaration of a mistrial by manifest necessity based upon a trial justice's determination that the jury is deadlocked under an abuse of discretion standard. *Arnold v. McCarthy,* 566 F.2d 1377, 1386 (9th Cir.1978); *United States v. Powless,* 546 F.2d 792, 796 (8th Cir.), *cert. denied,* 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977); *United States v. Larry,* 536 F.2d 1149, 1154 (6th Cir.), *cert. denied,* 429 U.S. 984, 97 S.Ct. 502, 50 L.Ed.2d 595 (1976); *People v. Rehberger,* 73 Ill.App.3d 964, 969, 29 Ill.Dec. 838, 841, 392 N.E.2d 395, 398 (1979); *State v. Libero,* 91 N.M. 780, 783, 581 P.2d 873, 876, *cert. denied,* 92 N.M. 180, 585 P.2d 324 (1978); *Commonwealth v. Plexico,* 270 Pa.Super. 543, 545, 411 A.2d 1219, 1220 (1979); *Patterson v. State,* 598 S.W.2d 265, 268 (Tex.Cr.App.1980); *Miller v. Commonwealth,* 217 Va. 929, 933, 234 S.E.2d 269, 272, *cert. denied,* 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1977); *Wheeler v. State,* 87 Wis.2d 626, 633, 275 N.W.2d 651, 654 (1979); *Peterson v. State,* 586 P.2d 144, 148 (Wyo.1978).

properly found that the jury was "genuinely deadlocked." *Linscott,* 416 A.2d at 260. In *Linscott,* we considered the number of hours the jury had deliberated and the number of communications indicating an inability to reach a verdict. 416 A.2d at 260. In addition, we noted that the justice asked only the foreman and not each individual juror whether there existed any reasonable expectation that the jury might reach an impartial verdict if permitted to deliberate longer. 416 A.2d at 260; *see Henderson,* 435 A.2d at 1108 (failure to question each juror individually may not render inquiry insufficient). Finally, we indicated that defense counsel was not provided with the opportunity to participate in the decision. *Linscott,* 416 A.2d at 260.

■ Having acted within those guidelines, the trial court in this case did not abuse its discretion. When the mistrial was declared at 8:56 p.m., the jury had deliberated for a total of eight hours. The jury sent out two communications indicating that they were deadlocked. After receiving the first note, the justice encouraged the jury to continue deliberations. Upon receiving the second note, the justice inquired of the foreman and of each member of the jury whether he or she believed the jury was hopelessly deadlocked. He declared a mistrial and then asked both the prosecutor and defense counsel to make a statement for the record.[5] A retrial of the defendant in such circumstances does not violate the double jeopardy clause of the Maine and the United States Constitutions.

## II. *Blood Test*

The defendant contends that by admitting during rebuttal the blood-alcohol test results obtained in violation of 29 M.R.S.A. § 1312(6) (1978), the justice committed reversible error. Title 29 M.R.S.A. § 1312(6) provides, in part:

> Only a duly licensed physician, registered nurse or a person certified by the Department of Human Services under certification standards to be set by that department, acting at the request of a law enforcement officer, with the consent of the defendant, may draw a specimen of blood for the purpose of determining the blood-alcohol level thereof. This limitation shall not apply to the taking of breath specimens.

In this case, at the time he took the defendant's blood sample, Mr. Campbell, a licensed physician's assistant, was not certified by the Department of Human Services. The defendant argues that a test not administered in compliance with 29 M.R.S.A. § 1312(6) is not admissible in evidence.[6]

The statute, however, does not provide that failure to comply with the requirements of administering the test shall render

---

5. The better practice would be to ask for counsels' comments before the actual declaration of a mistrial in view of the requirement that defense counsel be "given an opportunity to participate in the decision to grant a mistrial." *Linscott,* 416 A.2d at 260. Here, however, the comment of counsel was solicited immediately after the declaration of the mistrial, while the jury was still in the box and before it was discharged. Thus, the trial justice retained the then present ability to undo the mistrial if either counsel had articulated any persuasive reason to do so. No prejudice occurred by this order of events because both counsel stated only that they did not consent or agree to the mistrial. Defense counsel sought no reconsideration of the decision to declare the mistrial.

6. Although inapplicable in this case, title 29 M.R.S.A. § 1312(6) (Supp. 1982–1983) was revised to provide that:

> Only a duly licensed physician, *registered physician's assistant,* registered nurse or a person certified by the Department of Human Services under certification standards to be set by that department, acting at the request of a law enforcement officer, may draw a specimen of blood for the purpose of determining the blood-alcohol level of a person who is complying with the duty to submit to a blood-alcohol test and who has selected a blood test.
>
> . . . .
>
> Failure to comply with any provisions of this subsection or with any regulations promulgated in this subsection shall not, by itself, result in the exclusion of evidence of blood-alcohol level, unless the evidence is determined to be not sufficiently reliable.

(Emphasis added.)

the test results inadmissible. *Compare* 29 M.R.S.A. § 1312(6) (1978) (providing requirements for administration of test without making any reference to inadmissibility of results by virtue of noncompliance with requirements) *with* 29 M.R.S.A. § 1312(1) (1978) (describing prerequisite for test but also providing that failure to comply will result in inadmissibility of tests).[7] If the Legislature had intended to exclude evidence of blood-alcohol test results which were not obtained in compliance with section 1312(6), it would have specifically provided, as it did in section 1312(1), for the exclusion of such evidence upon noncompliance with the requirements of that section.

In addition, this Court has consistently determined that by enacting the implied consent statute, 29 M.R.S.A. § 1312, the Legislature intended to "increase the availability of reliable evidence as to the true state of a driver's sobriety." *State v. Carey,* 412 A.2d 1218, 1221 (Me.1980); *State v. Ayotte,* 333 A.2d 436, 439 (1975); *see State v. Jones,* 457 A.2d 1116 at 1121 (Me.1983). This Court has also found a general legislative policy of admissibility of blood-alcohol test results. *See State v. Adams,* 457 A.2d 416 at 420 (Me.1983). The Legislature, therefore, intended the blood-alcohol test results to be admissible in evidence unless unreliable. Indeed, although inapplicable to this case, the Legislature has recently revised section 1312(6) to provide that:

> Failure to comply with any provisions of this subsection or with any regulations promulgated in this subsection shall not, by itself, result in the exclusion of evidence of blood-alcohol level, unless the evidence is determined to be not sufficiently reliable.

P.L.1981, ch. 679 § 22 (effective April 15, 1982) (codified at 29 M.R.S.A. § 1312(6) (Supp.1982–1983)). We view this revision as a clear expression of a legislative policy which has existed since the enactment of the implied consent statute, that is, that

blood-alcohol test results are admissible unless unreliable.

■ The record in this case does not display any showing that the test results were unreliable because of the circumstances of the taking of the sample. *Cf. State v. Libby,* 453 A.2d 481, 489 (Me.1982). The evidence establishes that in this case the administration of the test by a licensed physician's assistant who was not certified by the Department of Human Services did not render the test unreliable. Mr. Campbell testified that he had worked in hospitals for ten years and that he had drawn 10,000 to 20,000 blood samples. In addition, Mr. Campbell testified that at the Calais hospital he had used the vacutainer kit to administer thirty to fifty blood-alcohol tests. Mr. Campbell stated that at the time he administered the test to the defendant he was a licensed physician's assistant. Further, he explained that he did not obtain certification from the Department of Human Services as required by 29 M.R.S.A. § 1312(6) (1978) because he did not know he had to do so. Under the circumstances of this case, Mr. Campbell was certainly qualified to administer the test. The test results were properly admitted in evidence.

Alternatively, even assuming that a test not administered in compliance with the statute renders the results inadmissible, the results may have been properly admitted as rebuttal testimony. The defense witnesses stated that they had seen the defendant drink five or six rum and Cokes during the evening of January 31 and a beer and a few swallows of a rum and Tab during the morning of February 1. After the testimony of Mr. Campbell, the physician's assistant who administered the test, Dr. James Young testified that at 8:15 p.m. on February 1, the defendant's blood-alcohol level was 181 milligrams of alcohol per 100 milliliters of blood. He further stated that such a level was inconsistent with the defense

---

7. *Compare* 29 M.R.S.A. § 1312(6) (Supp. 1982–1983) (failure to comply with requirements does not result in exclusion of results unless unreliable) *with* 29 M.R.S.A. § 1312(1) (Supp. 1982–1983) (although there exist prerequisites to test, "no test results shall be excluded" for failure to comply).

testimony and that by the testimony offered by the defense, the defendant's alcohol level would have been zero. The results were used to impeach the testimony of the defense witnesses. The justice did not thereafter give a limiting instruction on the purpose of such evidence. Defense counsel, however, did not request such an instruction.

Blood-alcohol test results may be admissible as rebuttal evidence provided the results are reliable. *Cf. Harris v. New York,* 401 U.S. 222, 225–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1, 4–5 (1971) (confession made without *Miranda* warning admissible on rebuttal to impeach defendant provided confession trustworthy), *cited with approval in, State v. Melvin,* 390 A.2d 1024, 1032 n. 4 (Me.1978); *State v. Marin,* 352 A.2d 746, 748 (Me.1976); *State v. Myers,* 345 A.2d 500, 502 (Me.1975). At trial, the defendant made no claim that the test results were unreliable. Consequently, the test results were properly admitted as rebuttal testimony. *Cf. Harris,* 401 U.S. at 224, 91 S.Ct. at 645, 28 L.Ed.2d at 4 (confession obtained without *Miranda* warning admissible on rebuttal provided confession trustworthy; defendant made no claim that statements were coerced or involuntary); *Melvin,* 390 A.2d at 1032 (defendant made no claim that confession involuntary, therefore, confession obtained without giving of *Miranda* warning admissible in rebuttal to impeach testimony of defendant).

The entry is

Judgment affirmed.

All concurring.