STATE of Maine

v.

Donald W. BAKER.

Supreme Judicial Court of Maine.

Argued Nov. 14, 1985.

Decided Dec. 24, 1985.

Gene Libby, Dist. Atty., David D. Gregory (orally), Alfred, for plaintiff.

Michelle Robert (orally), Biddeford, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN and SCOLNIK, JJ.

WATHEN, Justice.

Defendant Donald W. Baker was charged by indictment returned in the Superior Court (York County) with the offenses of manslaughter, 17–A M.R.S.A. § 203(1)(A) (1983), operating under the influence of intoxicating liquor, 29 M.R.S.A. § 1312–B(1) (Supp.1985–1986), and furnishing liquor to minors, 28 M.R.S.A. § 1058 (Pamph.1985). These charges arise out of a traffic accident that resulted in the death of a passenger in an automobile driven by the defendant. The Superior Court granted defendant's motion to suppress the results of a blood test administered shortly after the accident. The State appeals the suppression order pursuant to 15 M.R.S.A. § 2115–A(1) (1980). We vacate the order of the Superior Court.

### I.

This case involves a two vehicle collision that occurred near midnight on the evening of June 1–2, 1984 at the intersection of Boom Road and Route 5 in Saco. The first member of the Saco police department to arrive at the scene was Officer Demers. He spoke with two people who identified themselves as the drivers of the two vehicles. He noticed an odor of intoxicating liquor on defendant's breath. When the shift supervisor, Officer Tardif, arrived, Demers advised him that the accident appeared to be alcohol related and identified the two drivers. Tardif then observed the deceased passenger lying beside the highway next to an empty beer bottle. He also found empty beer bottles in defendant's car. Officer Tardif next examined the damage to both vehicles, their relative position, and skid and gouge marks on Route 5. When he first observed the defendant, he noticed that the defendant appeared to stagger. When he interviewed the defendant, Tardif detected a strong smell of alcohol and defendant admitted that he had been drinking. Officer Tardif also noted that defendant's eyes were bloodshot and his speech slurred.

Defendant was transported by ambulance to Webber Hospital where he was met by Officer Bourque, also of the Saco police department. Pursuant to orders re-

ceived via radio from Officer Tardif, Bourque read the defendant warnings from a so-called implied consent form and requested that he submit to a blood test. Defendant refused the test. Officer Bourque then instructed a registered nurse to administer a blood test to the defendant. Subsequently, Bourque placed the defendant under arrest.

Defendant moved to suppress the results of the blood test, claiming that the blood sample was taken in violation of both the fourth amendment to the United States Constitution and 29 M.R.S.A. § 1312(2) (Supp.1985–1986), Maine's implied consent law. The suppression justice found that the State had probable cause to believe that defendant was under the influence of intoxicating liquor at the time of the accident. Nevertheless, the court held that under *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the involuntary blood test constituted an unconstitutional search in violation of the fourth amendment to the United States Constitution and ordered the test results suppressed.

We disagree with the Superior Court's analysis of *Schmerber*, and finding no impediment, constitutional or otherwise, to the admission of the blood test results, we vacate the suppression order.

## II.

■ At the outset, defendant contends that the Superior Court erred in finding probable cause to believe that defendant was operating under the influence. The essence of probable cause is knowledge of facts constituting a reasonable ground for belief of guilt. *State v. Libby*, 453 A.2d 481, 484 (Me.1982); *State v. Walker*, 341 A.2d 700, 703 (Me.1975). This Court has repeatedly held that probable cause is to be evaluated based upon the collective knowl-

edge possessed by all police officers involved in an investigation. *State v. Libby*, 453 A.2d at 485; *State v. Blais*, 416 A.2d 1253, 1256 (Me.1980); *State v. Parkinson*, 389 A.2d 1, 8 (Me.1978). A finding of probable cause will be reversed only if clearly erroneous. *State v. Blais*, 416 A.2d at 1256; *State v. Carter*, 391 A.2d 344, 346 (Me.1978).

Defendant's challenge to the finding of probable cause rests upon his interpretation of Maine case law discussing probable cause based on collective information. Defendant argues that in light of the facts of those cases, and despite language to the contrary, collective information can support the existence of probable cause only if channeled through a single source. Defendant further argues that shift supervisor Tardif is the appropriate single source in this case and that information gathered by or conveyed to Officer Tardif was insufficient to establish probable cause.

■ We need not decide whether defendant correctly interprets Maine law for if we consider only the information possessed by Officer Tardif, the record amply supports the finding of probable cause. Before ordering Officer Bourque to obtain a blood sample from the defendant, Tardif possessed the following information: A passenger in defendant's automobile lay dead beside the highway. Empty beer bottles littered defendant's car. Defendant smelled of alcohol and admitted to drinking. Defendant displayed slurred speech and bloodshot eyes and had appeared to stagger while at the scene. In addition, Tardif testified that for the purpose of evaluating probable cause, he had inspected the accident scene and had concluded that the accident occurred because defendant's car ran a stop sign.[1] The Superior Court committed no error in finding the

---

1. At the suppression hearing, defendant objected to admission of the officer's conclusion regarding the cause of the accident as evidence supporting the existence of probable cause. The suppression justice overruled the objection. Defendant has not challenged this ruling on ap-

peal, and thus, has waived any objection he may have had to consideration of the officer's conclusion in determining the existence of probable cause. *Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 841 n. 6 (Me.1978).

existence of probable cause to believe that defendant was under the influence of intoxicating liquor at the time of the accident.

## III.

Despite its finding of probable cause, the Superior Court ordered the results of defendant's blood test suppressed, holding that under *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the blood test was taken in violation of defendant's fourth amendment right to be free from unreasonable searches and seizures. In *Schmerber,* the United States Supreme Court considered and rejected various constitutional challenges to the admission of the results of a blood test administered over objection to a person under arrest and suspected of driving while intoxicated. *Id.* The Superior Court interpreted *Schmerber* as holding that the results from an involuntary blood test are admissible under the fourth amendment only as a search incident to an arrest. Because defendant was not under arrest when his blood was drawn, the Superior Court ruled that the blood test in this case did not fall within the ambit of *Schmerber,* and thus violated defendant's fourth amendment rights.

The State argues that the existence of an arrest was not crucial to the holding in *Schmerber.* Rather, the State contends, the *Schmerber* decision rested upon the traditional justification for a warrantless search—probable cause and exigent circumstances. We agree.

In its discussion of defendant Schmerber's fourth amendment claim, the Supreme Court stated that "the mere fact of a lawful arrest does not end our inquiry." *Id.* at 769, 86 S.Ct. at 1835. After reciting the considerations underlying the doctrine of search incident to arrest, the Court concluded:

Whatever the validity of these considerations in general, they have little applica-

bility with respect to searches involving intrusions beyond the body's surface. The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is immediate search.

*Id.* at 769–70, 86 S.Ct. at 1835.

We interpret the quoted passage as a refusal by the Supreme Court to sanction an involuntary blood test based on the doctrine of search incident to arrest. The Court stated that the considerations underlying that doctrine have "little applicability" in the context of blood tests. More importantly, the Court rejected the administration of blood tests upon the "mere chance" of obtaining evidence, requiring instead that no test be given absent a "clear indication" that desired evidence would be found. Given that a search incident to arrest requires no additional justification beyond the existence of a lawful arrest, *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973), the Court's requirement of a "clear indication" reveals its determination to reject the doctrine of search incident to arrest as a sufficient basis for the taking of an involuntary blood test.

The *Schmerber* Court went on to analyze the blood test as a warrantless search, finding it constitutionally permissible because there existed both probable cause for the search and exigent circumstances obviating the necessity of obtaining a search warrant. *Id.* 384 U.S. at 770–71, 86 S.Ct. at 1835–36. Because *Schmerber* sanctioned the blood test as a warrantless search based upon probable cause and exigent circumstances rather than as a search incident to arrest,[2] the existence of an ar-

---

2. Although never called upon to identify the exact basis of the *Schmerber* decision, this Court

has often referred in dicta to the rationale underlying that decision. Some earlier decisions

rest did not control the admissibility of the test results in that case. Thus, the Superior Court erred by ruling that the blood test procedure in this case was constitutionally defective simply because defendant was not arrested before his blood was drawn.

■ The State argues that the record in this case satisfies the constitutional prerequisites to admission of the results of the blood test administered over defendant's objection. As discussed above, under *Schmerber* those prerequisites are probable cause to search and exigent circumstances justifying the execution of that search without a warrant. The Superior Court did not address the existence of adequate justification for such a warrantless search, finding only the existence of probable cause to believe that defendant was under the influence of intoxicating liquor at the time of the accident. However, having held this finding by the Superior Court to be amply supported by the record, *see supra* Part II, we are satisfied that from this single finding may be inferred probable cause for a search of defendant's blood and exigent circumstances requiring that the search be conducted promptly.

Probable cause for a search consists of information that would cause a reasonable and prudent person to believe that a search would disclose criminal conduct or evidence that would aid in identifying a criminal or establishing the commission of a crime. *State v. Libby*, 453 A.2d 481, 484–85 (Me. 1982); *State v. Smith*, 379 A.2d 722, 724–25 (Me.1977); *State v. Walker*, 341 A.2d 700, 703 (Me.1975). In this case, it is established that probable cause existed to believe defendant had operated a vehicle while under the influence of intoxicating liquor. Such operation is a crime. Furthermore, blood tests are recognized as "highly effective means" of establishing the existence of that crime. *Schmerber v. California*, 384 U.S. at 771, 86 S.Ct. at

did refer to *Schmerber* as involving a search incident to arrest. *State v. Bellino*, 390 A.2d 1014, 1020 (Me.1978); *State v. Van Reenan*, 355 A.2d 392, 395 (Me.1976). More recent Law Court opinions, however, have recognized

1836. *See also State v. Jones*, 457 A.2d 1116, 1121 (Me.1983) (blood tests are "reliable evidence of a driver's sobriety"). Accordingly, the same facts that create probable cause as to operation under the influence also create probable cause to believe that a blood test would reveal evidence of that crime.

Both this Court and the United States Supreme Court, however, have recognized that the human body continually eliminates alcohol from the blood. *Schmerber v. California*, 384 U.S. at 770, 86 S.Ct. at 1835; *Opinion of the Justices*, 255 A.2d 643, 651 (Me.1969). Accordingly, probable cause to believe that a blood test will reveal evidence of the crime of operating under the influence will decline with the passage of time. In this case, the record reveals that defendant's blood was drawn shortly after he was transported from the accident scene to a hospital. We conclude that the facts constituting probable cause to believe that defendant was operating under the influence, considered together with the time frame in which the blood test was administered, would cause a reasonable and prudent person to believe that such a test would reveal evidence of a crime.

■ The bodily process that eliminates alcohol also provides exigent circumstances obviating the need to obtain a warrant prior to administering a blood test. "[T]he delay occasioned by obtaining a search warrant could destroy the evidence." *State v. Libby*, 453 A.2d 481, 485 n. 4 (Me.1982) (citing *Schmerber v. California*, 384 U.S. at 770–71, 86 S.Ct. at 1835–36; *Opinion of the Justices*, 255 A.2d at 651). On this record, probable cause and exigent circumstances existed to justify, as a warrantless search, the administration of a blood test to defendant over his objection.

*Schmerber's* analysis of the blood test as a warrantless search to be supported by probable cause and exigent circumstances. *State v. Adams*, 457 A.2d 416, 421–22 (Me.1983); *State v. Libby*, 453 A.2d 481, 484 (Me.1982).

Finally, defendant contends that the blood test fails to meet *Schmerber's* requirement that the test be administered in a reasonable manner. *See Schmerber v. California,* 384 U.S. at 771–72, 86 S.Ct. at 1836. The Superior Court found that a registered nurse administered the blood test in a hospital setting. This case raises none of the concerns expressed in *Schmerber* as to blood tests performed in a police dominated setting by untrained personnel. *Id.* at 772, 86 S.Ct. at 1836. Defendant's claim is without merit.

Under the standards enunciated by the Supreme Court in *Schmerber v. California,* the blood test in this case constituted a permissible warrantless search. No constitutional impediment exists to the admission of the test results at defendant's trial.

## IV.

Defendant argues that even if the involuntary blood test administered in this case satisfies constitutional requirements, the results of that test must be excluded from evidence [3] because the taking of defendant's blood after he had refused a blood test violates Maine's implied consent law, 29 M.R.S.A. § 1312 (1978 & Supp.1985–1986). Subsection 1312(2) states that when a person suspected of operating under the influence refuses to submit to a test, "no test may be given." *Id.* § 1312(2) (Supp. 1985–1986). Although the statute does not expressly require the exclusion of test results, defendant contends that the statute implicitly requires the application of an exclusionary rule.

In interpreting a statute, we consider both the policy and the history of the statute in order to discover and implement the intent of the Legislature. *State v. Jones,* 457 A.2d 1116, 1120 (Me.1983); *State v. Bellino,* 390 A.2d 1014, 1021 (Me.1978). We have previously stated with reference to section 1312 that "the Legislature has established a firm general policy of admis-

sibility of blood-alcohol tests." *State v. Adams,* 457 A.2d 416, 419 (Me.1983). In addition, we have repeatedly stated that the Legislature's overall purpose in enacting the implied consent statute was "to 'increase the availability of reliable evidence as to the true state of a driver's sobriety.'" *State v. McConvey,* 459 A.2d 562, 568 (Me.1983) (quoting *State v. Carey,* 412 A.2d 1218, 1221 (Me.1980). *See also State v. Jones,* 457 A.2d 1116, 1121 (Me. 1983); *State v. Ayotte,* 333 A.2d 436, 439 (Me.1975). It would contravene this policy to infer an exclusionary rule from section 1312(2) where none is expressly provided.

Moreover, the history of section 1312 reveals both that the Legislature is fully capable of creating an exclusionary rule for violation of the provisions of section 1312 when it intends to do so and that the Legislature has twice recently expressed its intention that a violation of section 1312 not render blood test results inadmissible. When the Legislature first enacted Maine's implied consent law in 1969, the statute expressly provided that test results be excluded from evidence when police officers failed to inform the defendant adequately of the consequences of refusing the test. P.L.1969, ch. 439; *see* 29 M.R.S.A. § 1312(1) (1978). In 1979, the Legislature passed two amendments to section 1312 concerning the admissibility of evidence. First, the Legislature abrogated the exclusionary rule just mentioned and, instead, provided that test results be admissible despite the failure of police to comply with the statutory duty to inform the defendant of the consequences of refusing the test. P.L.1979, ch. 701; *see* 29 M.R.S.A. § 1312(1) (Supp.1985–1986). Second, the Legislature established that a person's refusal to submit to a test constitutes admissible evidence, providing, however, that such evidence be excluded if police failed to give adequate warnings. P.L.1979, ch. 701; *see* 29 M.R.S.A. § 1312(8) (Supp.1985–1986).

---

**3.** The State argues that in no event does section 1312(2) apply to the use of the test results with reference to the manslaughter charge. Because we find no exclusionary rule, we need not address the issue.

Finally, in 1981, the Legislature amended section 1312 to state that failure to comply with that section's requirements governing the manner in which tests are to be administered ·does not render test results inadmissible unless they are shown to be unreliable.[4] P.L.1981, ch. 679 § 22; *see* 29 M.R.S.A. § 1312(6) (Supp.1985–1986).

■ We note that at no time has section 1312 contained a provision addressing the admissibility of the results of blood tests administered after a refusal to submit. The statute's history, however, demonstrates the Legislature's cognizance of the evidentiary implications created by the failure of authorities to comply with the various requirements in section 1312. On two occasions the Legislature has decided that such a failure should not render reliable test results inadmissible. In fact, the only exclusionary rule remaining in the statute governs the use of the fact of refusal as evidence, not the use of test results. From the history of section 1312, we cannot find any implicit legislative intention that reliable blood test results must be excluded because the test was administered after defendant's refusal, although in conformity with constitutional requirements. We hold that the results of the blood test administered to defendant in this case are admissible.

The entry is:

Suppression order vacated.

Remanded to the Superior Court for order denying defendant's motion to suppress.

All concurring.

---

**4.** The rule established by the 1981 amendment is substantially identical to the holding of *State v. McConvey,* 459 A.2d 562 (Me.1983). The amendment became effective prior to the *McConvey* decision but too late to be applicable to that case. The *McConvey* court, however, did note the existence of the new amendment, viewing it as an expression of legislative intent that reliable blood tests be admissible despite noncompliance with the provisions of § 1312. *Id.* at 568.